**EQUAL ACCESS FOR EL PASO, INC. et al., Plaintiffs,**

v.

**Albert HAWKINS, Commissioner of the Texas Health and Human Services Commission, Defendant.**

**No. EP–03–CA–440–PRM.**

United States District Court,
W.D. Texas,
El Paso Division.

March 30, 2006.

R. Rodriguez, Andres Eduardo Almanzan, Mounce, Green, Myers, Safi, Miguel Angel Torres, El Paso, TX, for Plaintiffs.

Nancy K. Juren, Office of Attorney General, General Litigation Division Capitol Station, Austin, TX, for Defendant.

---

Thomas H. Watkins, Elizabeth G. Bloch, Brown McCarroll, LLP, Austin, TX, David W. Hilgers, Hilgers & Watkins, Kitty Schild, Maria Aurelia Salas–Mendoza, Jose

*ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S AMENDED MOTION TO DISMISS AND CERTIFICATION FOR INTERLOCUTORY APPEAL*

MARTINEZ, District Judge.

## TABLE OF CONTENTS

I. FACTUAL AND PROCEDURAL BACKGROUND ..........................593
 A. The Medicaid Act ............................................593
 B. The Administration of Medicaid in Texas ....................593
 C. The Parties ................................................594
 D. Plaintiffs' Claims .........................................594

II. DEFENDANT'S RULE 12(b)(1) MOTION ..................................596
 A. Article III Standing and Prudential Considerations ........596
 B. Recipient Plaintiffs' Standing to Sue .....................598
 C. Provider Plaintiffs' Standing to Sue ......................604
 D. Equal Access's Standing to Sue ............................606
 E. Plaintiffs' Standing to Assert Their Supremacy Clause Claim ................607

III. DEFENDANT'S RULE 12(b)(6) MOTION .................................609
 A. Analytical Standard .......................................609
 B. The Equal Access Provision ................................611
 C. The Quality of Care Provision .............................614
 D. The Comparability Provision ...............................616
 E. The Equity Provision ......................................618
 F. The Statewideness Provision ...............................619
 G. The Reasonable Promptness Provision .......................620
 H. The Actuarial Soundness Provision .........................622
 I. Cognizable Supremacy Clause Claim .........................623
 J. Cognizable Equal Protection Clause Claim ..................624
 K. Declaratory Judgment Relief ...............................625

IV. PRINCIPLES OF JUDICIAL ADMINISTRATION—THE *FREW* CLASS.....626

V. CERTIFICATION FOR INTERLOCUTORY APPEAL ......................627

VI. CONCLUSION .......................................................627

On this day, the Court considered the following: (1) Defendant Albert Hawkins' ("Defendant") "Amended Motion to Dismiss," filed on May 18, 2005; (2) Plaintiffs Equal Access for El Paso, Inc.; El Paso County Hospital District d/b/a R.E. Thomason General Hospital; El Paso First

Health Plans, Inc.; Dr. Jose Luna, Jr.; Monica Rivero, individually and as next friend of Kevin Rivero; Patricia Duarte Melendez, individually and as next friend of Orandie Jahssar Melendez–Duarte and Osnar Joshua Melendez; Jessilyn Nagel, as next friend of Heidi and McKenna Armstrong; and Ruth Gallegos's, individually and as next friend of Amber Villegas, (collectively "Plaintiffs") "Joint Response to Defendant Albert Hawkins's Amended Motion to Dismiss" ("Amended Motion to Dismiss"), filed on June 14, 2005; and (3) Defendant's "Reply on Amended Motion to Dismiss," filed on July 6, 2005 in the above-captioned cause. The Court also considered the oral arguments of counsel submitted at a status conference held on February 14, 2005.

After due consideration, the Court is of the opinion that Defendant's Amended Motion to Dismiss should be granted in part and denied in part for the reasons set forth below. The Court is also of the opinion that the above-captioned cause should be certified for interlocutory appeal to the Court of Appeals for the Fifth Circuit.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case concerns alleged violations of the Medicaid Act, 42 U.S.C. § 1396, *et seq.* Specifically, Plaintiffs—comprised of (1) Medicaid recipients in El Paso County, Texas ("El Paso"); (2) Medicaid providers in El Paso; and (3) an association purporting to represent the interests of Medicaid recipients and providers in El Paso—are alleging that low Medicaid payment rates have impeded the access of El Paso Medicaid recipients to the medical services guaranteed by the Medicaid Act.

### A. The Medicaid Act

"In the Social Security Amendments of 1965, Congress established Title XIX, commonly referred to as the 'Medicaid Act.'"

*Evergreen Presbyterian Ministries Inc. v. Hood,* 235 F.3d 908, 914 (5th Cir.2000) (citing Pub.L. No. 89–97, 79 Stat. 286 (1965)). The Medicaid Act established a medical assistance program ("Medicaid") cooperatively funded by federal and state governments, which is designed to ensure the provision of medical services to disabled individuals and families with dependent children. Pls.' First Am. Compl., at 7, ¶ 19.

A state's participation in Medicaid is voluntary, but a participating state must adhere to the requirements of the Medicaid Act in order to receive federal funding. *Evergreen,* 235 F.3d at 915. One such requirement is that a state must submit a state plan to the Health Care Financing Administration for approval. *Id.* "A state plan is a 'comprehensive written statement' submitted by the state describing the nature and scope of the state's Medicaid program." *Id.* (citing 42 C.F.R. § 430.10). "The Medicaid Act sets out a laundry list of ... items that must be contained within a valid state plan." *Id.* at 915 (citing 42 U.S.C. § 1396a(a) (2000)). Plaintiffs' claims include alleged violations of six of these requirements for a state Medicaid plan contained within the Medicaid Act. Texas has chosen to participate in Medicaid and has designated the Texas Health and Human Services Commission ("HHSC"), over whom Defendant Albert Hawkins is the commissioner, to administer the state's Medicaid plan. *Id.*

### B. The Administration of Medicaid in Texas

HHSC pays Medicaid providers through two programs: (1) a traditional "fee-for-service" program; and (2) payments to managed care providers based on capitation rates. Pls.' First Am. Compl., at 3, ¶¶ 3–4. Under the fee-for-service program, health care professionals are reim-

bursed based on fee schedules established by HHSC, schedules that break down medical procedures into discreet codes, which in turn are each assigned a monetary value. *Id.* at 3, ¶ 3. In addition to the fee-for-service program, HHSC administers payments to certain managed care providers, such as health maintenance organizations ("HMOs"), through capitation rates,[1] which are fixed amounts paid to participating providers on a per-member, per-month basis. Border Rate Report, at 3–4.

### C. The Parties

Plaintiffs, who are suing Defendant in his official capacity as Commissioner of HHSC, are comprised of three distinct classes. The first class consists of a collection of Medicaid recipients residing in El Paso, Texas (collectively "Recipient Plaintiffs"). Recipient Plaintiffs are suing as individuals on their own behalf and on behalf of their respective children.

The second class consists of a doctor providing services to Medicaid recipients, an HMO, and a county hospital district (collectively "Provider Plaintiffs"). Provider Plaintiff Jose Luna, Jr., M.D. is suing on his own behalf and on behalf of his Medicaid recipient patients. Provider Plaintiff El Paso First Health Plans, Inc. ("El Paso First") is an HMO that is suing on its own behalf and on behalf of its Medicaid recipient enrollees. Provider Plaintiff El Paso Hospital District d/b/a R.E. Thomason General Hospital ("Thomason") owns and operates R.E. Thomason Hospital, an urban hospital, El Paso First Plans, Inc., and Thomason Cares Inc., a health organization that provides physician services. Thomason also employs health care professionals. Thomason is *suing* on its own behalf and on behalf of its Medicaid recipient patients.

The third class consists solely of Equal Access for El Paso, Inc. ("Equal Access"), a non-profit corporation "composed of individuals interested in the provision of health care in El Paso." Pls.' First Am. Compl., at 5, ¶ 10. Equal Access is suing on behalf of its members, many of whom it alleges are "Medicaid recipients and other health care professionals and other providers who are directly and adversely impacted by HHSC's actions." *Id.*

### D. Plaintiffs' Claims

Plaintiffs filed suit against Defendant in federal court on October 23, 2003 and subsequently amended their complaint on June 24, 2004. Generally, Plaintiffs allege that HHSC's setting of deficient Medicaid reimbursement and capitation rates[2] has prevented Medicaid recipients in El Paso from obtaining adequate access to medical services, in violation of certain provisions of the Medicaid Act, the Supremacy Clause, and the Equal Protection Clause. The alleged lack of access to adequate medical services is a result of the fact that inadequate Medicaid payment rates, when

---

**1.** Speaking generally, "[i]n United States health services, capitation refers to a fixed 'per capita' amount that is paid to a hospital, clinic, or doctor for each person served." *Camacho v. Tex. Workforce Comm'n,* 326 F.Supp.2d 803, 805 (W.D.Tex.2004). Apparently, HHSC develops future capitation payment rates using data from past fee-for-service claims for Medicaid services delivered in a geographic area before managed care is implemented. Pls.' App. to Their Resp. to Def's. Am. Mot. Dismiss, Ex. 1, Border Rate

Workgroup on Medicaid and CHIP Final Report (hereinafter "Border Rate Report"), at 3. HHSC takes the fee-for-service data, based on cost and utilization of services, and projects the data for future years using trend factors. *Id.* at 4. HHSC then converts the average fee-for-service amount into a per-member, per-month figure and discounts that amount to obtain the capitation payment amount. *Id.*

**2.** *See supra* note 1 (explaining capitation rates).

combined with El Paso's unique payor mix,[3] have created an incentive (1) for physicians to practice in communities other than El Paso and (2) for physicians practicing in El Paso County to seek out patients covered by employer-sponsored insurance. Pls.' First Am. Compl., at 14, ¶ 42.

Specifically, Plaintiffs' amended complaint sets forth eight claims, alleging six violations of the federal Medicaid Act under 42 U.S.C. § 1983 (" § 1983"), violations of the Supremacy Clause, and a Fourteenth Amendment Equal Protection violation. Plaintiffs' first count alleges that HHSC's Medicaid payment rates for the El Paso area: (1) are deficiently priced to enlist enough providers so that care and services are available to the Medicaid recipients residing in the El Paso area to the extent care and services are available to the general (non-Medicaid) population in the El Paso area; and (2) are "not consistent with efficiency, economy, and quality of care," in violation of 42 U.S.C. § 1396a(a)(30)(A) and 42 C.F.R. § 447.204. Pls.' First Am. Compl., at 21, ¶ 44. Plaintiffs' second count alleges that medical assistance available to El Paso Medicaid recipients is less in "amount, duration, and scope" than assistance made available to Medicaid recipients and "other individuals in other geographic areas," resulting in the denial of equal treatment and comparable care, contrary to 42 U.S.C. § 1396a(a)(10)(B) and 42 C.F.R. §§ 440.230 and 440.240. Id. at 22, ¶ 48. Plaintiffs' third count alleges that HHSC's Medicaid plan's distribution of federal and state funds, in conjunction with the "lack of adequate funds from local sources in the El Paso region," has resulted in the "lowering of the amount, duration, scope and quality of care and service" made available

to Plaintiffs, in violation of 42 U.S.C. § 1396a(a)(2). Id. at 22–23, ¶ 51. Plaintiffs' fourth count alleges that HHSC failed to operate and administer the state Medicaid plan under equitable standards that are mandatory throughout the state, in violation of 42 U.S.C. § 1396a(a)(1) and 42 C.F.R. § 431.50(b)(1). Id. at 23, ¶ 54. In connection therewith, Plaintiffs also argue that it is inequitable for Texas to benefit from the poverty level in El Paso through increased federal funding while HHSC fails to ensure that El Paso receives proper and timely services through appropriate funding. Id. at 22–23, ¶ 54. Plaintiffs' fifth count alleges that medical assistance made available to Plaintiffs and other El Paso Medicaid recipients is not furnished with reasonable promptness to all eligible individuals, in violation of 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.930. Id. at 24, ¶ 57. Plaintiffs' sixth count alleges that HHSC has failed to establish capitation rates on an actuarially sound basis and concludes that HHSC's contracts with managed care organizations therefore violate 42 U.S.C. § 1396b(m)(2)(A)(iii). Pls.' First Am. Compl., at 25, ¶ 60. Plaintiffs' seventh count alleges that House Bill 1 ("HB1") of the 78th Texas Legislature and HHSC's practices in administering Medicaid in El Paso County violate the Supremacy Clause of the U.S. Constitution due to inconsistencies with 42 U.S.C. §§ 1396a(a)(30)(A), (a)(10)(B), (a)(2), (a)(1), (a)(8), and 1396b(m)(2)(A)(iii). Id. at 25, ¶ 23. Finally, Plaintiffs' eighth count alleges that HHSC does not treat El Paso Medicaid enrollees equally when compared with other individuals in Texas, in that Medicaid recipients in El Paso receive much less funding per person than the average Medicaid recipient in Texas, in violation of the Equal Protection Clause of

---

**3.** "Payor mix" refers to the percentage of people in a given geographic area that (1) are covered by Medicaid; (2) are covered by employer-sponsored medical insurance; and (3) are uninsured, respectively. Pls.' First Am. Compl., at 20, ¶ 40.

the Fourteenth Amendment. *Id.* at 26, ¶ 66. As a result of the aforementioned alleged violations, Plaintiffs seek injunctive and declaratory relief pursuant to § 1983, Title 28 of United States Code § 2201, and Federal Rule of Civil Procedure 57.

On May 18, 2005, Defendant filed an Amended Motion to Dismiss contending that all Plaintiffs lack standing to maintain any of the above-listed causes of action, mandating a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") for lack of subject-matter jurisdiction. Alternatively, Defendant argues that Plaintiffs fail to state a claim under any of the above-listed causes of action, requiring dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). Defendant also asks the Court to find that the minor plaintiffs' ("Plaintiff-children") claims are barred because of an ongoing class action. Finally, Defendant asks the Court, in the event of a denial of its motion to dismiss, to certify this case for interlocutory appeal to the Court of Appeals for the Fifth Circuit. The Court will address each of Defendant's arguments in turn.

## II. DEFENDANT'S RULE 12(b)(1) MOTION

### A. *Article III Standing and Prudential Considerations* [4]

■ The federal judicial power extends only to actual "cases" and "controversies." U.S. CONST. art. III, § 2, cl. 1. Thus, it is well-settled that the Court may act only "in the context of a justiciable case or controversy." *Securities Exch. Comm'n v. Med. Comm. for Human Rights,* 404 U.S. 403, 407, 92 S.Ct. 577, 30

L.Ed.2d 560 (1972) (internal quotations and citation omitted). "The several doctrines that have grown up to elaborate that requirement are 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The term standing refers to "whether [a] particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen,* 468 U.S. at 752, 104 S.Ct. 3315. "[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor ... clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *United States v. Hays,* 515 U.S. 737, 743, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (internal quotations and citations omitted). Standing is composed of both constitutional Article III requirements and prudential considerations. *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 124 S.Ct. 2301, 2308, 159 L.Ed.2d 98 (2004).

### 1. *Article III Requirements*

■ "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. First, a plaintiff must show he has suffered an injury-in-fact. *Id.* That is, a plaintiff must allege, and ultimately prove, that he has suffered a harm that is con-

---

**4.** The Court will first evaluate whether any class of plaintiffs has standing to assert any of the causes of action at issue. *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."). If the Court finds that any plaintiffs have standing, it will proceed to evaluate Defendant's motion to dismiss pursuant to Rule 12(b)(6).

crete and particularized and actual and imminent, not merely conjectural or hypothetical. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130.

■ Second, the plaintiff must demonstrate a causal connection between the injury and the defendant's alleged conduct. *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. This means that the injury must be one that is fairly traceable to "the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). The "fairly traceable" standard does not require that a defendant's conduct be the sole cause of the plaintiff's injury. *See Etuk v. Slattery*, 936 F.2d 1433, 1441 (2nd Cir.1991) (finding the causation prong satisfied and noting that, "[w]hile perhaps not the sole cause, the alleged improper conduct of the [Defendant] plainly constituted a primary factor in the harm that plaintiffs contend they have suffered and will continue to suffer").

■ Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (internal quotations and citations omitted). "To survive a motion to dismiss, a plaintiff 'must allege facts from which it reasonably could be inferred that, absent the [defendant's conduct], there is a substantial probability that … if the court affords the relief requested, the asserted [injury] will be removed.'" *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366

F.3d 930, 944 (D.C.Cir.2004) (quoting *Warth*, 422 U.S. at 504, 95 S.Ct. 2197 (1975)). Plainly, the relief sought must redress the injury suffered by the plaintiff.[5] *Steel Co.*, 523 U.S. at 107, 118 S.Ct. 1003 ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."). Reference to mere possibilities that a favorable decision from the court would provide redress for a plaintiff's injuries is insufficient to satisfy the redressability prong. *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 942 (noting that an associational plaintiff's reliance on the possibility that a favorable decision would confer "better odds" that its members' injuries would be redressed fell far short of the standard set by other cases where the redressability prong was satisfied).

#### 2. Prudential Standing Requirements

"Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *McClure v. Ashcroft*, 335 F.3d 404, 411 (5th Cir.2003) (citation omitted). Prudential considerations encompass both third-party standing and standing for associations to sue on behalf of their members.

#### a. Third–Party Standing

■ Ordinarily, a plaintiff must assert his own legal rights and cannot rest his claims on the rights of third-parties. *Powers v. Ohio*, 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). However, some litigants may bring an action on behalf of third-parties if three criteria are

---

**5.** The relief sought need not completely, or with certainty, redress the alleged injury, though it must, at least, significantly redress the injury. *Int'l Ladies Garment Workers Union v. Donovan*, 722 F.2d 795, 812 n. 27 (D.C.Cir.1983). Relief sufficiently redresses injury "if the relief [a plaintiff] seeks would redress the injury in whole or in part and thus confer a material benefit on [the plaintiff]." *Bruggeman v. Blagojevich*, 324 F.3d 906, 909 (7th Cir.2003).

satisfied. *Id.* First, "[t]he litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute[.]" *Id.* (citation omitted). Second, the litigant must have a close relation to the third-party. *Id.* Third, "there must exist some hindrance to the third party's ability to protect his or her own interests." *Id.*

### b. Associational Standing

■ Similarly, an association or organization has standing to bring suit on behalf of its members if three criteria are met. *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). First, members of the organization must otherwise have standing to sue in their own right. *Id.* Second, the interests the organization seeks to protect must be germane to the organization's purpose. *Id.* Third, "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* The first two requirements are Article III case or controversy requirements, while the third requirement is a prudential limitation that may be abrogated by congressional action. *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 555–56, 558, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

As an overall principal, at the pleading stage, a plaintiff's complaint must "sufficiently [allege] a redressable injury-in-fact which is causally connected to the alleged conduct of [a defendant].... '[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.' " *Meadowbriar Home for Children v. Gunn,* 81 F.3d 521, 529 (5th Cir.1996) (quoting *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130).

The Court will now proceed to determine each class of plaintiff's standing to sue in light of the applicable law, as well as the standing of all the plaintiffs to assert their Supremacy Clause claim.

### B. Recipient Plaintiffs' Standing to Sue

#### 1. Injury-in-fact

■ Defendant contends that Recipient Plaintiffs lack standing to bring any of the causes of action brought asserted to the Medicaid Act. Both parties concede that Recipient Plaintiffs have alleged an injury-in-fact in that Recipient Plaintiffs represent that they have experienced difficulties in accessing medical assistance in the El Paso area. This lack of access is manifested in difficulty encountered in obtaining appointments from a medical provider that accepts Medicaid, excessively long waiting periods while in providers' offices, and a complete lack of certain medical services for Medicaid recipients in the El Paso area resulting in Recipient Plaintiffs' need to travel to other parts of the state to receive the services. Additionally, Plaintiffs allege an overall shortage of medical service professionals (whether or not they accept Medicaid patients) in the El Paso area, a problem which Plaintiffs indicate arguably implies that El Paso physicians have migrated to other areas of Texas. *See* Pls.' First Am. Compl., at 10, ¶ 25 (claiming that one Recipient Plaintiff's "problems stems from lack of physicians and therapists in the El Paso area"); *id.* at 10, ¶ 26 (alleging that one Recipient Plaintiff's "problems stem form the lack of physicians and dentists in the El Paso area").

At issue is whether, at this stage of the litigation, Recipient Plaintiffs have adequately pled the causation and redressability requirements necessary for standing to sue for their alleged injuries comprising difficulties in accessing medical services paid for by Medicaid funds.

## 2. Causation

■ Recipient Plaintiffs allege that their difficulties in obtaining adequate access to medical care is the result of "extremely low payment schedules under Medicaid." Pls.' First Am. Compl., at 10, ¶ 25. Hence, Recipient Plaintiffs attempt to attribute their injuries to HHSC, which sets the Medicaid reimbursement and capitation rates for the state of Texas.

A concept integral to Plaintiffs' causation theories is described by the term "payor mix." "Payor mix" refers to the percentage of residents in a particular geographic area that have employer-provided insurance, are covered by Medicaid, or are uninsured, respectively. Pls.' First Am. Compl., at 20, ¶ 40. According to Plaintiffs, other counties in Texas, though similar in size to El Paso, have payor mixes more favorable to medical providers. *Id.* That is, these counties have a higher percentage of residents with private insurance coverage, coverage which reimburses providers at higher rates than Medicaid.[6]

Plaintiffs allege that low payment rates have resulted in inadequate access to medical services [7] for El Paso Medicaid recipients through two distinct intermediate mechanisms: (1) creating an incentive for health care professionals in El Paso to curtail their participation in Medicaid or drop out completely; and (2) creating an incentive for health care professionals in El Paso to relocate to other parts of the state. Although Plaintiffs assert these causal mechanisms jointly, the Court will examine each mechanism separately for the sake of clarity.[8] However, if the Court determines that Plaintiffs' injuries are fairly traceable to HHSC's conduct through the first mechanism, the Court need only analyze the second mechanism to determine whether it renders Plaintiffs' overall causation theory too speculative. The Court will begin by analyzing the first causation mechanism, the curtailment and termination of the participation of El Paso medical professionals in Medicaid.

Defendant argues that Plaintiffs' claims are indistinguishable from the claims of the plaintiffs in *Allen v. Wright*, 468 U.S. 1250, 105 S.Ct. 51, 82 L.Ed.2d 942 (1984), and in *Simon v. E. Ky. Welfare Rights*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). In *Allen*, parents of black public school children brought a nation-wide class action against the Internal Revenue Service ("IRS"), alleging that the IRS had "not adopted sufficient standards and procedures to fulfill its obligation to deny tax-exempt status to racially discriminatory private schools." 468 U.S. at 739, 104 S.Ct. 3315. As a result of the IRS's ac-

---

**6.** As an example, Plaintiffs' complaint notes that, according to the 2000 census, 32 percent of El Paso County residents had employer-provided insurance, 16 percent were covered by Medicaid, and 35 percent were uninsured. Pls.' First Am. Compl., at 20, ¶ 40. In contrast, in Travis County, 69 percent of residents have private insurance, only 5 percent are covered by Medicaid, and 18 percent are uninsured. *Id.*

**7.** Although the Court finds a lack of access to medical care to be Recipient Plaintiffs' core injury, they also allege related injuries such as a failure to receive access to medical care equal to that of Medicaid recipients in other parts of the state. However, the Court finds that Recipient Plaintiffs only state a cognizable claim under the portion of the Medicaid Act which the Court refers to as the "Equal Access Provision," as discussed *infra* in Part III. Therefore, it is not necessary for the Court to discuss alleged injuries more directly tied to other provisions of the Medicaid Act.

**8.** The necessity for this approach becomes apparent when the Court explains the second mechanism's dependence on El Paso's payor mix, an independent factor that weakens the connection between low rates and Recipient Plaintiffs' alleged injuries.

tions, the parents alleged harm in the form of interference with their children's abilities to receive an education in desegregated public schools. *Id.* at 739–40, 104 S.Ct. 3315.[9] However, the Court held that the chain of causation between the IRS's alleged conduct and desegregation at the plaintiffs' schools was "attenuated at best." *Id.* at 757, 104 S.Ct. 3315. The Court held that it was speculative (1) "whether withdrawal of a tax exemption from any particular school would lead the school to change its policies;" and (2) "whether, in a particular community, a large enough number of the numerous relevant school officials and parents would reach decisions that collectively would have a significant impact on the racial composition of public schools." *Id.* at 758, 104 S.Ct. 3315.

In *Simon,* indigents and organizations composed of indigents brought suit against the Secretary of the Treasury and the Commissioner of the IRS, alleging that the IRS violated the Internal Revenue Code and the Administrative Procedure Act "by issuing a Revenue Ruling allowing favorable tax treatment to a nonprofit hospital that offered only emergency-room services to indigents." 426 U.S. at 29, 96 S.Ct. 1917. The *Simon* plaintiffs alleged that the IRS's Revenue Ruling "had 'encouraged' hospitals to deny services to indigents." *Id.* at 42, 96 S.Ct. 1917. However, the Court held that it was speculative "whether the denials of service specified in the complaint fairly can be traced to [the IRS's] 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." *Id.* at 42–43, 96 S.Ct. 1917. As the *Allen* Court explained in its discussion of *Simon,* "the causal connection [in *Simon* ] depended on the decisions hospitals would make in re-

sponse to withdrawal of tax-exempt status, and those decisions were sufficiently uncertain to break the chain of causation between the plaintiffs' injury and the challenged Government action." *Allen,* 468 U.S. at 759, 104 S.Ct. 3315.

In the instant case, like in *Allen* and *Simon,* Plaintiffs' causation theory (focusing on their first causal mechanism) requires the Court to engage in speculation to some extent. In order to conclude that HHSC's setting of low payment rates results in a denial of access, the Court must assume that higher rates would have discouraged medical providers from curtailing or terminating their involvement in Medicaid. To make this assumption, like in *Allen* and *Simon,* the Court must speculate as to the actions of an independent third party. Like the schools in *Allen* and the hospitals in *Simon,* the Court must assume that medical providers, if given higher payment rates, would have chosen to maintain their current levels of involvement in Medicaid. This assumption is made more difficult in light of the fact that the Medicaid Act does not quantify the level at which a state must set payment rates in order to comply with its requirements. In fact, as long as HHSC pays Medicaid providers one dollar less than private insurance pays, medical professionals would arguably have an incentive to prefer private insurance. Therefore, it is difficult to know whether the increased rates would have provided a sufficient incentive for medical providers to continue participation in Medicaid. Additionally, the Court must assume that a large enough percentage of providers would have decided to continue their participation in Medicaid to bring about a significant impact on the level of access to medical services for El Paso

9. The *Allen* plaintiffs actually alleged two forms of harm. *Allen,* 468 U.S. at 752, 104 S.Ct. 3315. However, the Court held that the first alleged harm, a stigma resulting from racial discrimination, did not constitute a judicially cognizable injury. *Id.* at 753, 104 S.Ct. 3315.

Medicaid recipients. *See Allen,* 468 U.S. at 758, 104 S.Ct. 3315 (requiring the plaintiffs to show that if the IRS had adequately enforced anti-discrimination policies it would have had a *"significant impact* on the racial composition of public schools") (emphasis added). Finally, like in *Simon,* the Court must speculate whether the decisions of Medical providers to decrease involvement in Medicaid was a result of low payments or of independent factors.[10]

Although the circumstances in *Allen* and *Simon* were arguably similar to the instant case, the Court finds that they are distinguishable, in part because of the characteristics of the Medicaid Act. Specifically, a portion of 42 U.S.C. § 1396a(a)(30)(A), which portion the Court will refer to as the "Equal Access Provision,"[11] actually requires the *result* that medical services must be available to Medicaid recipients in a geographic area "at least to the extent that such care and services . . . are available to the general population in a geographic area." *See Clark v. Richman,* 339 F.Supp.2d 631, 633 (stating that "the equal access provision is results-oriented").[12] Therefore, although a statute cannot relax the requirements of Article III standing, the terms of the statute informs the Court's counterfactual speculation. Literal compliance with the Equal Access Provision by its very terms requires a certain

amount of access to medical services that Plaintiffs claim does not currently exist. Therefore, it is less tenuous for the Court to speculate that compliance with the statute would have resulted in better access to healthcare, when compared with the degree of speculation required of the *Allen* and *Simon* Courts.

Furthermore, other courts have recognized the connection between access to medical services and low reimbursement rates, a connection made by the Equal Access Provision itself. *See Okla. Chapter of the Am. Acad. of Pediatrics v. Fogarty,* 366 F.Supp.2d 1050, 1106–07 (N.D.Okla. 2005) ("While there is no established percentage for sufficient Medicaid reimbursement rates under federal law, rates which consistently fall well below what is allowed under Medicare, let alone under private insurance, have been shown to be inadequate to attract enough providers . . . ."); *Memisovski v. Maram,* No. 92 C 1982, 2004 WL 1878332, at *42 (N.D.Ill. Aug.23, 2004) (stating that "[r]ates and equal access [to medical services] simply cannot be divorced") (unpublished opinion);[13] *Clayworth v. Bonta,* 295 F.Supp.2d 1110, 1116 (E.D.Cal.2003) (finding that Medicaid recipient plaintiffs presented sufficient evidence that some Medicaid providers would cease participating in Medicaid or refuse to take new patients if rates were re-

---

**10.** For example, Plaintiffs' complaint indicates one factor that contributed to the decisions of medical professionals to curtail involvement in Medicaid is El Paso's unique payor mix. *See infra* p. 19 (discussing the impact of El Paso's payor mix on Plaintiffs' causation theory).

**11.** The Equal Access Provision is significant because it is the only provision of the Medicaid Act pursuant to which the Court finds that Plaintiffs have stated a cognizable claim, as discussed *infra* Part III.

**12.** 42 U.S.C. § 1396a(a)(30)(A) (" § 30(A)") states in relevant part as follows:

A State plan for medical assistance must— (30)(A) provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as . . . are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services care available to the general population in the geographic area[.]

**13.** Though *Memisovski* is an unpublished opinion, the Court finds that its reasoning and logic persuasively apply to the instant case. 5TH CIR. R. 47.5.4 (stating "[a]n unpublished opinion may . . . be persuasive").

duced), *rev'd on other grounds,* 140 Fed. Appx. 677 (9th Cir.2005); *Thomas v. Johnston,* 557 F.Supp. 879, 903–04 (W.D.Tex. 1983) (reasoning that "[t]he link between the adequacy of reimbursement rates paid to providers and the adequacy of care provided to Medicaid recipients is quite obvious"). Invariably, the link between a lack of access and low reimbursement rates (to the extent a court explains the connection) is through the mechanism of low reimbursement rates creating an incentive for medical professionals to curtail or terminate their participation in Medicaid. *See, e.g., Fogarty,* 366 F.Supp.2d at 1063 (finding that Oklahoma pediatricians choose not to participate in Medicaid due to low reimbursement rates); *Clayworth,* 295 F.Supp.2d at 1116 (deciding that the plaintiffs had presented sufficient evidence that some California Medicaid providers would cease participating in the state's program or curtail their participation if the reimbursement rates were reduced by 5%).

Although several courts have found a sufficient connection between reimbursement rates and a lack of medical services, one unique feature of Plaintiffs' claims is that they attribute their injuries in part to El Paso's unique payor mix. In addition to *enabling* (as a necessary factor) the second mechanism, Plaintiffs allege that El Paso's payor mix *contributes* to the first mechanism's unique effect on the El Paso area because medical professionals who remain in El Paso have an increased financial incentive to terminate involvement in Medicaid, when compared with professionals in regions with more favorable payor mixes. Pls.' First Am. Compl., at 3, ¶ 3.[14] This incentive is a result of the fact that an El Paso provider who accepts Medicaid patients is forced to accept the lower paying patients as a larger portion of the provider's business. Pls.' First. Am. Compl., at 3, ¶ 3. However, Plaintiffs do not allege that the payor mix is a result of HHSC's actions.

The fact that Plaintiffs' own complaint admits that the independent factor of El Paso's unique payor mix contributes to their lack of access militates against a finding that Recipient Plaintiffs' injuries are fairly traceable to low rates. However, at least one court has found that an allegation about the effects of the payor mix is not fatal to a plaintiff's allegation that low reimbursement rates caused a denial of access to medical care. *See Fogarty,* 366 F.Supp.2d at 1064–65 (finding that the "high percentage" of Medicaid recipients in rural Oklahoma counties contributed to the effects of low reimbursement rates on access to medical services in those counties). In addition, the "fairly traceable" standard does not require that a defendant's conduct be the sole cause of the plaintiff's injury. *See Etuk,* 936 F.2d at 1441 (finding it sufficient that the defendant's conduct was a "primary factor" in the plaintiff's injuries). Therefore, although it is a close question, the Court finds that Plaintiffs' allegation about the effects of the payor mix does not alter its conclusion that Recipient Plaintiffs' injuries are fairly traceable to HHSC's conduct through the first mechanism. For similar reasons, the Court finds that Plaintiff's second alleged mechanism, also dependent on El Paso's payor mix, does not render Plaintiffs' causation theory too speculative.[15] Thus the Court finds that

---

**14.** With respect to the second mechanism, the flight of El Paso medical professionals, the fact that the payor mix is a necessary condition makes the mechanism less likely to withstand Article III standing scrutiny than Plaintiffs' first causation mechanism, when viewing the mechanisms in isolation.

**15.** Another possible distinguishing feature of Plaintiffs' claims is that Plaintiffs allege both inadequate reimbursement rates (a somewhat common claim) and inadequate capitation rates (a unique claim). Plaintiffs appear to claim that low reimbursement rates *caused* their injuries and low capitation rates *perpetu-*

Plaintiffs' alleged lack of access to medical services is fairly traceable to HHSC's conduct.

### 3. Redressability

 To redress the alleged violations of the Medicaid Act, Plaintiffs seek an injunction enjoining HHSC from failing to comply with the Medicaid Act, and specifically from failing to set payment rates in El Paso sufficiently "to enlist enough providers so that care and services are available to Plaintiffs at least to the extent that such care and services are available to the general population." Pls.' First Am. Compl., at 27.

In order to evaluate Plaintiffs' allegations of redressability, it is necessary to understand the relief mechanisms through which Plaintiffs claim their injury will be redressed by a favorable decision. Similarly to their causation theory, Plaintiffs' redressability theory again relies on two mechanisms: (1) if HHSC raises Medicaid payment rates, medical professionals already in El Paso will decide to begin or increase their involvement in Medicaid; or (2) if HHSC raises payment rates, medical professionals will decide to return to El Paso.[16]

Again, the Court will begin by analyzing the merits of Plaintiffs' redressability argument by focusing on the first redressability mechanism in isolation. In order to conclude that Plaintiffs' requested relief would result in better access to medical services, Plaintiffs ask the Court to engage in speculation similar to that required of the Court in its causation analysis. Specifically, the Court must conclude that raising Medicaid payment rates would result in (1) medical professionals deciding to begin or increase their involvement in Medicaid and (2) enough professionals making this decision to significantly impact Recipient Plaintiffs' access to medical services.

However, once again the Court's speculation is aided by the requirements of the Equal Access Provision. Plaintiffs' requested relief, by definition, will result in increased access to medical services. Although the Equal Access Provision cannot lower the constitutional requirements of redressability, it is by its nature results-oriented. *See Clark v. Richman,* 339 F.Supp.2d 631, 633 (stating that "the equal access provision is results-oriented").[17]

*ate* their injuries. Pls.' First Am. Compl., at 21, ¶ 42. However, the fact that Plaintiffs allege both low reimbursement and low capitation rates does not alter the Court's standing analysis. Plaintiffs' allegation of inadequate reimbursement rates is sufficient in and of itself, and the additional allegation regarding inadequate capitation rates does not render Plaintiffs' overall theory too speculative.

16. Plaintiffs now attempt to claim that it is only necessary to show that raising rates would eliminate the incentives for medical professionals to curtail involvement in Medicaid or migrate to other areas of Texas. However, it is necessary for Plaintiffs to show that the Court's action would redress *their injury,* namely, a lack of access to medical care. Plaintiffs cannot lower the constitutional requirements of redressability by couching their injury in terms of the incentives of medical professionals to take certain actions.

17. The fact that the Equal Access Provision is results-oriented should factor into a court's decision whether Congress intended it to create a private right of Action. A court should view a provision as precatory rather than mandatory if literal compliance with the statute is unrealistic. *See infra* Part III(A)(2) (describing the appropriate standard for determining whether a statute creates a federal right enforceable under § 1983). However, the Court ultimately concludes that it is bound by Fifth Circuit precedent to hold that the Equal Access Provision confers a private right of action upon Medicaid recipients. *See infra* Part III(B) (holding that the Equal Access Provision confers a private right of action upon Recipient Plaintiffs). Furthermore, the fact that the statute requires unrealistic results does not alter the Court's redressability analysis.

Additionally, as discussed above, other courts have found similar claims to meet the requirements of redressability. *See supra* p. 18 (listing cases that have found claims alleging inadequate reimbursement rates sufficient to meet the requirements of Article III standing). Therefore, the Court finds that it is not too speculative to conclude that a favorable decision would redress Recipient Plaintiffs' injuries through the first redressability mechanism.

Additionally, the Court finds that Plaintiffs' second redressability mechanism does not render Plaintiffs' overall redressability theory too speculative.[18] Therefore, the Court finds that it is likely that Recipient Plaintiffs' injuries will be redressed by the requested relief. Thus, Recipient Plaintiffs meet all three requirements of Article III standing to allege that low Medicaid payment rates have resulted in their lack of access to medical services.

### C. Provider Plaintiffs' Standing to Sue

Provider Plaintiffs assert claims both on their own behalf and on behalf of the Medicaid recipients they serve. The Court concludes that Provider Plaintiffs' have standing to sue on their own behalf, but not on behalf of their patients.

#### 1. Provider Plaintiffs' Standing on Their Own Behalf[19]

■ Plaintiffs allege that Provider Plaintiffs have suffered the following inju-

ries as a result of low Medicaid payment rates: (1) Provider Plaintiffs provide medical services for inadequate payment rates; (2) Provider Plaintiffs are "incapable of serving the existing Medicaid population in El Paso"; (3) Provider Plaintiffs' "Medicaid Recipient patients are deprived of their right to receive safe, timely, and adequate medical care"; (4) Plaintiff Thomason "is unable to provide [adequate] services to its Medicaid recipient patients"; and (5) Plaintiff El Paso First is unable "to develop the kind of provider base necessary to ensure that Medicaid recipients have access to Medicaid services equivalent to that of non-Medicaid recipients." Pls.' First Am. Compl., at 13–15.

Defendant argues that the first three injuries asserted by Provider Plaintiffs, as well as Plaintiff Thomason's alleged injury, involve the denial of access to medical services to Provider Plaintiffs' *patients* rather than to Provider Plaintiffs themselves. Similarly, Defendant argues that the injury asserted by El Paso First is an injury to its members. As a result, Defendant asserts that Provider Plaintiffs cannot meet the requirements of standing because they are asserting the injuries of their patients or members. *See Cent. & Sw. Srvs., Inc. v. U.S. Envtl. Prot. Agency.*, 220 F.3d 683, 699 (5th Cir.2000) (stating that "a party may not base its Article III standing on alleged injuries to others").

However, in addition to the allegations more directly implicating their patients'

---

**18.** Like Plaintiffs' causation theory, the second redressability mechanism's dependence on El Paso's payor mix renders Plaintiffs' overall redressability theory more speculative. However, for the same reasons mentioned when addressing Plaintiffs' second causation mechanism, the Court finds that Plaintiffs' second redressability mechanism does not render Plaintiffs' overall redressability theory too speculative. *See Fogarty*, 366 F.Supp.2d at 1064–65 (addressing the merits of the plaintiff's Equal Access claim despite allega-

tions based in part on the "high percentage" of Medicaid recipients in rural Oklahoma counties); *Bruggeman*, 324 F.3d at 910 (stating that "[s]tanding is a matter of probabilities rather than certainties").

**19.** The Court ultimately concludes that Provider Plaintiffs have not asserted any cognizable claims under the Medicaid Act. However, the Court will address Provider Plaintiffs' standing for the sake of thoroughness.

interests, Provider Plaintiffs also allege that HHSC's payment rates, which are paid to Provider Plaintiffs, are inadequate. Pls.' First Am. Compl., at 13, ¶ 30. This is an injury to Provider Plaintiffs themselves. *See Clayworth,* 295 F.Supp.2d at 1116 (stating that Medicaid providers would "suffer concrete injury" as a result of a reimbursement rate cut if allowed to go into effect); *see also Evergreen,* 235 F.3d at 928 (addressing whether Medicaid providers have a private right of action to challenge a reimbursement rate cut as a violation of § 30(A) without addressing the providers' standing). Therefore, the Court holds that Provider Plaintiffs' injuries are sufficiently particularized.

Additionally, Plaintiffs do not contest that Provider Plaintiffs meet the requirements of causation and redressability. Furthermore, the Court finds that the allegedly inadequate payment rates received by Provider Plaintiffs are fairly traceable to HHSC's actions and that it is not too speculative to conclude that a favorable decision would result in higher rates. Low rates themselves are the injury to Provider Plaintiffs. Therefore, the Court is not required to engage in the same speculation required in its causation and redressability analysis of Recipient Plaintiffs' injuries. Thus, Provider Plaintiffs have properly asserted standing with respect to their claims that they perform medical services for inadequate rates.

### 2. *Provider Plaintiffs' Third–Party Standing*

 As discussed above, Provider Plaintiffs have alleged an injury-in-fact to themselves, namely, inadequate payment rates. Additionally, Defendant does not contest the fact that Provider Plaintiffs have a close relationship with their patients. Therefore, the only remaining issue for the Court to decide is whether there exists some hindrance to Provider Plaintiffs' patients' abilities to protect their own interests. *Powers,* 499 U.S. at 410, 111 S.Ct. 1364. This inquiry requires the Court to examine "the likelihood and ability of the third parties ... to assert their own rights." *Id.* at 414, 111 S.Ct. 1364.

Provider Plaintiffs allege that "the vast majority of their Medicaid recipient patients do not have access to the level of information necessary to assert their rights, and even if they did have such information, they lack the resources to assert their rights." Pls.' First Am. Compl., at 14, ¶ 30. This assertion is a mere legal conclusion that is insufficient to support third-party standing. *See Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993) (stating that "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss"). Provider Plaintiffs do not allege what *kind* of information Provider Plaintiffs have that their patients lack. In contrast, in *Clayworth* the Medicaid providers, who were suing to enjoin a state-wide rate cut of 5%, specifically alleged that they were the ones "who [knew] the relationship of reimbursement to service and to their costs." *Clayworth,* 295 F.Supp.2d at 1118. As a result, the providers in *Clayworth* were "in a far better position to evaluate the State's decisional process and the data relied upon by the State in determining reimbursement rates." *Id.*

The only cognizable claim any plaintiffs assert is Recipient Plaintiffs' claim that HHSC's payment rates violate the Equal Access Provision of the Medicaid Act. *See infra* Part III (analyzing Plaintiffs' claims to determine whether they survive Defendant's Rule 12(b)(6) motion to dismiss). Unlike the providers in *Clayworth,* Provider Plaintiffs do not allege that they are in a better position to compare the access to medical services of Medicaid recipients in El Paso with the access of the general

population in El Paso. *See infra* Part III(B)(2) (explaining the nature of a cognizable Equal Access Provision claim).

Additionally, the bare assertion that patients lack resources is insufficient, in and of itself, to establish third-party standing. *Cf. Powers*, 499 U.S. at 415, 111 S.Ct. 1364 (noting several specific "practical barriers to suit by the [third-party jurors whose interests the plaintiffs seek to represent]" such as the difficulty "for an individual juror to show a likelihood that discrimination against him at the voir dire stage will recur"). Simply put, Provider Plaintiffs have provided the Court with no significant information about the likelihood and abilities of Provider Plaintiffs' patients to assert their own rights. In fact, the claims in this case brought by several El Paso Medicaid recipients (and an organization partially comprised of Medicaid recipients) undermine the argument that Medicaid recipients do not have the incentive or ability to bring claims on their own behalf. Therefore, prudential considerations require the Court to hold that Provider Plaintiffs have not established standing to assert any claims on behalf of their patients.

### D. Equal Access's Standing to Sue

 The Court finds that Equal Access has alleged sufficient facts to establish standing pursuant to the three *Hunt* factors. Under the first *Hunt* factor, to establish associational standing Equal Access must allege that the members of its organization would otherwise have standing to sue in their own right. *Hunt*, 432 U.S. at 343, 97 S.Ct. 2434. Plaintiff Equal Access seeks to sue "on behalf of its members, many of whom are Medicaid recipients and health care professionals and other providers who are directly and adversely impact-

ed by HHSC's actions, and on behalf of the its [sic] member health care professionals' and providers' patients." Pls.' First Am. Compl., at 10, ¶ 5. The Court has found that Recipient Plaintiffs have standing to challenge their access to medical services resulting from allegedly inadequate Medicaid payment rates.[20] It has also determined that Provider Plaintiffs have standing to challenge the allegedly inadequate payment rates they receive.[21] Equal Access alleges that its members include those who have suffered the same injuries as Recipient Plaintiffs and Provider Plaintiffs. Pls.' First Am. Compl., at 10, ¶ 5. Therefore, Equal Access satisfies the first *Hunt* factor.

Under the second *Hunt* factor, the interests Equal Access seeks to protect in bringing its claims must be germane to the organization's purpose. *Hunt*, 432 U.S. at 343, 97 S.Ct. 2434. Equal Access alleges that "[t]he purpose of Plaintiff Equal Access is to develop health care resources and access to health care in El Paso County." Pls.' First Am. Compl., at 10, ¶ 5. Recipient Plaintiffs sue to remedy the alleged injury of a lack of access to medical services. The interest of access to medical services is Equal Access's stated goal. Therefore, Equal Access satisfies the second *Hunt* factor.

Under the third *Hunt* factor, Equal Access must show that neither the claims it asserts nor the relief it requests requires the participation of its individual members. *Hunt*, 432 U.S. at 343, 97 S.Ct. 2434. In *Clayworth*, the court granted associational standing in part because "no showing on damages" and no "individual proof by beneficiary members" would be required. *Clayworth*, 295 F.Supp.2d at

---

**20.** *See supra* Part II(B) (discussing the standing of Recipient Plaintiffs).

**21.** *See supra* Part II(C)(1) (discussing the standing of Plaintiff Recipients to sue on their own behalf).

1119. Similarly, in the instant case Medicaid recipients and providers do not seek individualized damages. Rather, they seek injunctive and declaratory relief. Additionally, Plaintiffs' claims will not necessarily require the proof of individual Medicaid recipients and providers.[22] Therefore, Equal Access satisfies the third *Hunt* factor. Thus, the Court finds that Plaintiff Equal Access satisfies the three *Hunt* factors and has standing to sue on behalf of its member Medicaid recipients and providers.

### E. Plaintiffs' Standing to Assert Their Supremacy Clause Claim

Plaintiffs' Supremacy Clause claim alleges that both (1) HB1 of the 78th Texas Legislature (the General Appropriations Act) and (2) HHSC's "regulations, policies, practices and procedures for administering Medicaid services in El Paso County" violate the Supremacy Clause of the U.S. Constitution. Pls.' First Am. Compl., at 25, ¶ 63. Plaintiffs seek relief for these alleged violations "under 42 U.S.C. § 1983." *Id.* at 26, ¶ 64. The Court will analyze each claim in turn to determine if

Plaintiffs have adequately established standing.

### 1. House Bill 1

▆▆ Plaintiffs allege that HB1 violates the Supremacy Clause in that it conflicts with several provisions of the Medicaid Act.[23] In *Planned Parenthood of Houston & Southeast Tex. v. Sanchez*, 403 F.3d 324 (5th Cir.2005), the Fifth Circuit recognized a claim that Rider 8 to the Texas General Appropriations Act was preempted by the Medicaid Act. Unlike the *Planned Parenthood* plaintiffs, the plaintiffs in the instant case do not allege that a specific portion of HB1 conflicts with the Medicaid Act.[24]

The U.S. Supreme Court has stated that "state law is nullified to the extent that it actually conflicts with federal law." *Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Plaintiffs' Supremacy Clause claim would result in a partial nullification of HB1 to the extent that it sets inadequate payment rates. *Id.* However, unlike the plaintiffs claiming a conflict with the Medicaid Act in *Planned Parenthood*, Plaintiffs have not identified a portion of HB1, which, if nullified, would redress their alleged injuries.[25] Further-

---

**22.** For example, Plaintiffs' claim under the Equal Access Provision, the only part of the Medicaid Act pursuant to which the Court ultimately concludes Plaintiffs have stated a claim, requires a comparison between the access of Medicaid and non-Medicaid recipients to medical services in the El Paso area. Although individual instances of a lack of access to services might be helpful, it would not be absolutely necessary in such a comparison. At the very least, no fact-specific inquiry into individual instances of a lack of access to medical services will be required. *Cf. Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l Planning Agency*, 365 F.Supp.2d 1146, 1163 (D.Nev.2005) (finding that the association failed the third *Hunt* test because a "fact-specific" analysis of the association's members would be required).

**23.** This challenge to HB1 appears to be limited to Plaintiffs' Supremacy Clause claim.

**24.** Plaintiffs' complaint makes reference to "[l]ine items B.2.1 through B.2.8 of the Medicaid Budget." Pls.' First Am. Compl., at 19, ¶ 39. However, this appears to be a reference to "Legislative Budget Board Recommendations," rather than to HB1. *See* Def. Albert Hawkins's Mot. to Dismiss (hereinafter "Original Mot. to Dismiss"), App. A. (showing that B.2.1 through B.2.8 are Medicaid program spending recommendations made by the Legislative Budget Board).

**25.** Similarly, Plaintiffs' complaint fails to show how any portion of HB1 has caused their injuries. Therefore, the Court has no way to determine whether Plaintiffs' injuries are fairly traceable to HB1.

more, it is purely speculative whether the legislature would appropriate more money in the future as a result of the nullification of some unspecified portion of HB1. *See Henderson v. Stalder,* 287 F.3d 374, 381 (5th Cir.2002) (holding that a plaintiff lacked standing to challenge the funding to the "Choose Life" message because even it was declared unconstitutional, the plaintiff's "complained of injury would not be redressed as that remedy will not provide [the plaintiff] a forum in which to express her pro-choice viewpoint").

In fact, Plaintiffs state that they are not "asking for abrogation of HB1." Pls.' Joint Resp. to Def. Albert Hawkins' Am. Mot. to Dismiss (hereinafter "Joint Resp."), at 9, ¶ 24. Plaintiffs' actual grievance appears to be directed at the manner in which HHSC *implements* HB1, rather than at the legislature's appropriation of resources to Medicaid. *See* Pls.' First Am. Compl., at 19, ¶ 39 (stating that "Defendant is ultimately responsible for implementing these Acts of the Legislature by setting the Medicaid budget for the Texas Health and Human Services Commission"); Joint Resp., at 10, ¶ 24 (responding to Defendant's contention that Plaintiffs' challenge to portions of HB1 would result in the nullification of those portions by restating their claims that Texas "must *administer* a state plan that meets federal requirements") (emphasis added). Plaintiffs have neither adequately specified which portions of HB1 violate the Medicaid Act, nor have they shown how the nullification of a portion of HB1 is likely to redress any of their alleged injuries. Furthermore, Plaintiffs do not seek the nullification of a portion of HB1. Therefore, Plaintiffs have failed to meet their burden of establishing standing for their claim that HB1 violates the Medicaid Act.

### 2. HHSC's Implementation of Medicaid

 In addition to challenging HB1, Plaintiffs also allege that HHSC's "regulations, policies, practices and procedures for administering Medicaid services in El Paso" violate the Supremacy Clause. Pls.' First Am. Compl., at 25, ¶ 73. Specifically, Plaintiffs allege that HHSC's setting of low payment rates violates the Medicaid Act. As discussed above, the Court has determined that Plaintiffs' have suffered injuries-in-fact that are fairly traceable to HHSC's setting of rates, the same injuries and conduct challenged by Plaintiffs' Supremacy Clause claim. *See supra* Part II(B)(2), (C)(1) (explaining why Recipient Plaintiffs and Provider Plaintiffs meet the first two prongs of Article III standing). Additionally, if Plaintiffs are successful, it is not too speculative to determine that a declaration of the invalidity of HHSC's practices would result in the redress of Plaintiffs' alleged injuries, a lack of access to medical services in the case of Recipient Plaintiffs, and the receipt of payment for services provided at inadequate rates in the case of Provider Plaintiffs. *See supra* Part II(B)(3), (C)(1) (explaining why Recipient Plaintiffs and Provider Plaintiffs meet the requirements of constitutional redressability).[26] Therefore, Plaintiffs have standing to allege that HHSC's implementation of Medicaid violates the Supremacy Clause in that it is inconsistent with certain provisions of the Medicaid Act. Having determined that Recipient Plaintiffs, Provider Plaintiffs, and Plaintiff Equal Access have standing, the Court will proceed to examine Defendant's Motion to Dismiss pursuant to Rule 12(b)(6).

**26.** A favorable decision under Plaintiffs' Supremacy Clause claim would likely have the same effect as its § 1983 claim alleging a violation of the Equal Access Provision.

## III. DEFENDANT'S RULE 12(b)(6) MOTION

Plaintiffs sued and seek recovery under six separate provisions of the Medicaid Act, the Equal Protection clause of the U.S. Constitution, and the Supremacy Clause of the U.S. Constitution. Defendant alleges (1) that the Medicaid Act provisions do not create a private right of action and (2) that each of Plaintiffs' eight counts fails to state a cognizable claim.

### A. Analytical Standard

#### 1. 12(b)(6) Standard Generally

Rule 12(b)(6) permits the dismissal of a complaint if it "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When presented with a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and construe all reasonable inferences in the light most favorable to the plaintiff. *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996). A plaintiff must plead specific facts in his complaint; conclusory allegations are insufficient to survive a Rule 12(b)(6) motion to dismiss. *See Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982) (citing *Associated Builders, Inc. v. Ala. Power Co.,* 505 F.2d 97, 100 (5th Cir.1974)) (stating that "we do not accept as true conclusionary allegations in the complaint"). The Court then must determine whether the facts alleged, if true, would entitle the plaintiff to some form of relief. *Harris v. Hegmann,* 198 F.3d 153, 156 (5th Cir.1999). Importantly, a Rule 12(b)(6) motion "tests only the formal sufficiency of the statements of the claims for relief. It is not a procedure for resolving contests about the facts or the merits of the case." *Jolly v. Klein,* 923 F.Supp. 931, 942 (S.D.Tex.1996). Thus, "[n]ormally, in deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1017 (5th Cir.1996).

Rule 12(b)(6) motions are "viewed with disfavor and [are] rarely granted." *Kaiser,* 677 F.2d at 1050. The Court may dismiss a complaint pursuant to Rule 12(b)(6) only if it is convinced that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Specifically, the Court may dismiss a complaint pursuant to Rule 12(b)(6) only if it finds "either (1) 'the lack of a cognizable legal theory' or (2) 'the absence of sufficient facts alleged under a cognizable legal theory.' " *Meador v. Oryx Energy Co.,* 87 F.Supp.2d 658, 661 (E.D.Tex. 2000) (citing *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988)). At some level, the facts alleged must relate to the legal theories pled by a plaintiff or otherwise allege a claim based on a cognizable, though perhaps unstated, legal theory. *See In re Colonial Mortgage Bankers Corp.,* 324 F.3d 12, 15 (1st Cir.2003) (noting that in applying the Rule 12(b)(6) standard, "[the court] assume[s] the truth of all well-pleaded facts and indulge[s] all reasonable inferences that fit the plaintiff's stated theory of liability"); *see also Ramming v. United States,* 281 F.3d 158, 162 (5th Cir.2001) ("[W]hen considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the district court must examine the complaint to determine whether the allegations provide relief on any possible theory.").

With respect to Plaintiffs' claims under the Medicaid Act, Defendant argues that Plaintiffs have failed to state a cognizable legal theory because the provisions of the Medicaid Act pursuant to which Plaintiffs have sued do not create private rights of

action. With respect to all of Plaintiffs' claims, Defendant argues that Plaintiffs' complaint does not state a cognizable claim because the facts alleged do not support a cognizable legal theory.

### 2. The Standard for Determining if a Statute Confers a Private Right of Action

■ In order to state a cognizable legal theory, plaintiffs must demonstrate that the law provides them both a right and a remedy. Section 1983 provides a remedy to vindicate certain federal rights by providing for liability against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983's provision for liability extends to rights conferred by federal statutes. *Maine v. Thiboutot*, 448 U.S. 1, 12–13, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). However, § 1983 requires a plaintiff to assert a "violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997).

■ In determining whether a particular federal statutory provision gives rise to a federal right, courts traditionally look at the following three factors:

First Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision

giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Id.* at 340–41, 117 S.Ct. 1353 (internal citations and quotations omitted). Recently, the Supreme Court has clarified the traditional *Blessing* analysis by emphasizing that actions brought under § 1983 require nothing "short of an unambiguously conferred right." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). The *Gonzaga* Court rejected the view of some courts "allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect." *Id.* In other words, it is "*rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." *Id.*

The *Gonzaga* Court held that the Supreme Court's "implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983." *Id.* The initial inquiry "is to determine whether or not a statute 'confers rights on a particular class of persons.'" *Id.* at 285, 122 S.Ct. 2268 (quoting *California v. Sierra Club*, 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981)). Critical to this determination is an inquiry into whether the statute contains "rights-creating language." *Id.* at 284, 122 S.Ct. 2268. As an example of such a statute, the *Gonzaga* Court proffered Title IX of the Education Amendments of 1972, which states: "*No person* in the United States *shall*, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." *Id.* (quoting 20 U.S.C. § 1681(a)) (emphasis in *Gonzaga*). The *Gonzaga* Court emphasized that Title IX is "phrased in terms of the person benefitted." *Id.*

■ If a plaintiff establishes that a statute creates a federal right, "the State may rebut this presumption by showing that Congress 'specifically foreclosed a remedy under § 1983.'" *Id.* at 285 n. 4, 122 S.Ct. 2268 (quoting *Smith v. Robinson,* 468 U.S. 992, 1004–05, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984)). The state can meet this burden "either expressly, through specific evidence from the statute itself," or it can do so "impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 284, 122 S.Ct. 2268 (internal quotations and citations omitted). Therefore Plaintiffs must initially demonstrate that Congress unambiguously conferred a federal right in every provision of the Medicaid Act under which Plaintiffs attempt to sue.

### B. The Equal Access Provision

#### 1. Private Right of Action

■ Plaintiffs' first count asserts a claim under the Equal Access Provision, contained in § 30(A) and its implementing regulation, 42 C.F.R. 447.204.[27] The Equal Access Provision requires a state plan to provide for procedures, including those related to payment, which are "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services care available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A). The Court will analyze whether the Equal Access Provision creates a private right of action for the benefit of each class of plaintiffs in turn.

#### a. Right of Action for Recipient Plaintiffs[28]

In *Evergreen,* the Fifth Circuit held that the Equal Access Provision of the Medicaid Act creates a federal right in favor of Medicaid recipients that is enforceable under § 1983. *Evergreen,* 235 F.3d at 927. However, *Evergreen* was decided before the Supreme Court's decision in *Gonzaga,* a case which clarified the standard for determining whether a federal statute creates a private right of action.[29] As a result, Defendant asks the Court to reevaluate the Fifth Circuit's decision in *Evergreen* in light of *Gonzaga's* holding that a statute must "unambiguously" confer a federal right upon plaintiffs to be enforceable under § 1983. *Gonzaga,* 536 U.S. at 300, 122 S.Ct. 2268.

The Court will not disregard *Evergreen,* which it recognizes as a binding precedent,

---

**27.** The Court need not separately analyze whether the implementing regulation creates a private right of action. *See Bryson v. Shumway,* 177 F.Supp.2d 78, 92 (D.N.H.2001) (holding that an implementing regulation cannot create a private right of action unless the statute which it seeks to enforce creates a private right of action). However, an implementing regulation can be useful to further define and flesh out the meaning of a statute. *See id.* (explaining that "so long as the statute itself confers a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute—in conjunction with the regulation—may create a federal right as further defined by the regulation") (internal quotations and citations omitted).

**28.** This analysis also applies to Plaintiff Equal Access to the extent it is suing on behalf of its members who are Medicaid recipients.

**29.** Although the Fifth Circuit has not had an occasion to revisit *Evergreen,* it has given at least some indication that it still considers *Evergreen* to be good law. In *S.D. v. Hood,* 391 F.3d 581, 605 (5th Cir.2004), the Fifth Circuit cited with approval its finding in *Evergreen* that the "the 'equal access' mandate of § 1396a(a)(30)(A) is not too vague to be enforceable." However, this mention of *Evergreen* merely affirms the Fifth Circuit's previous finding regarding the second factor in *Blessing,* a factor not directly impacted by *Gonzaga.*

unless it is clear that *Evergreen's* holding conflicts with the intervening *Gonzaga* opinion. *See Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 178 F.Supp.2d 1305, 1313 (stating that "a trial court may not disregard the controlling precedent of its appellate court where an intervening Supreme Court decision merely casts doubt on the continuing viability of that precedent, rather than directly overruling it"). To make this determination, it is necessary to analyze the basis of the Fifth Circuit's decision in *Evergreen* and the impact of *Gonzaga* on the decision.

The *Evergreen* court based its decision on an analysis of the three factors articulated in *Blessing*. The first *Blessing* factor, whether Congress intended that the provision in question benefit the plaintiff, was the factor most directly impacted by *Gonzaga*. In the *Evergreen* court's analysis of the first *Blessing* factor, the court found that Medicaid recipients were the intended beneficiaries of the Equal Access Provision. *Evergreen*, 235 F.3d at 927–28. The court emphasized that Medicaid recipients are "intended *beneficiaries* of section 30(A) because the provision is 'phrased in terms' *benefitting* recipients." *Id.* at 927 (emphasis added) (quoting *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 510, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990)).

The *Evergreen* court's focus on the intended benefit of a statute appears typical of the looser "benefit" or "zone of interest" standard that the Supreme Court teaches

against in *Gonzaga*. *Gonzaga*, 235 F.3d at 283 (rejecting "a relatively loose standard" that would conclude that a statute confers a federal right "so long as Congress intended that the statute 'benefit' putative plaintiffs"). Notably absent from the court's discussion is an analysis of whether § 30(A) contains "rights-creating language," language which the *Gonzaga* Court describes as "critical to showing the requisite congressional intent to create new rights." *Id.* at 287, 122 S.Ct. 2268.[30]

However, although at first blush the *Evergreen* decision appears to apply the looser "benefit" standard, there are some indications in the decision that the Fifth Circuit was applying a the more rigorous analysis required by *Gonzaga*. For example, the Fifth Circuit recognized that *Wilder*, which found that the Medicaid Act conferred a private right, was narrowed by subsequent cases, such as *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), and *Blessing*, and that "Congress must unambiguously confer through section 30(A) an 'individual entitlement' upon each of the plaintiffs in the case." *Evergreen*, 235 F.3d at 926–27 (quoting *Blessing*, 520 U.S. at 343, 117 S.Ct. 1353). The *Gonzaga* Court cites *Suter* as a case that foreshadowed the principle made clear in *Gonzaga*, namely, that the Supreme Court's "implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983." *Gonzaga*, 536

---

**30.** Strengthening Defendant's argument that the Fifth Circuit is likely to overturn *Evergreen's* holding that § 30(A) confers a federal right on Medicaid recipients is the fact that "[s]ince *Gonzaga*, no federal court of appeals ... has concluded that § 30(A) provides Medicaid recipients or providers with a right enforceable under § 1983." *Sanchez v. Johnson*, 416 F.3d 1051 (9th Cir.2005). In *Sanchez*, the Ninth Circuit recently considered whether § 30(A) confers a private right of action upon Medicaid beneficiaries. *Id.*

The *Sanchez* court held that § 30(A) failed the first prong of the *Blessing* test because (1) the language of § 30(A) has an aggregate rather than an individual focus; and (2) "the flexible, administrative standards embodied in the statute do not reflect a Congressional intent to provide a private remedy for their violation." *Id.* at 1059. *See also supra* note 17 (explaining that the Equal Access Provision is results-oriented, which militates against a finding that Congress intended it to confer a private right of action).

U.S. at 283, 122 S.Ct. 2268. Therefore, the Fifth Circuit's acknowledgment that *Suter* narrowed *Wilder* indicates that it was not applying the "loose" benefit standard implicated by *Wilder*. Furthermore, the *Evergreen* court clarified that it must determine whether the Medicaid statute "confers a federal *right* on each of the plaintiffs in the case." *Evergreen*, 235 F.3d at 927 (emphasis added). Requiring that a statute confer a right, instead of merely a benefit, also suggests that the court's analysis in *Evergreen* does not conflict with *Gonzaga*. Thus, the Court finds that *Gonzaga* does not clearly conflict with *Evergreen*.

As a result of the fact that *Gonzaga* neither explicitly overturns nor clearly conflicts with *Evergreen*, the Court finds that *Evergreen* remains binding precedent on the Court. As a result, the Court finds that the Equal Access Provision of § 30(A) confers a private right of action upon Recipient Plaintiffs.

### b. Right of Action for Provider Plaintiffs [31]

■ In *Evergreen*, the Fifth Circuit explicitly held that the Equal Access Provision does not create a private right of action for Medicaid Providers. No subsequent case law casts doubt upon this conclusion. In fact, *Gonzaga* only strengthens the *Evergreen* court's conclusion because the Equal Access Provision contains no rights-creating language with respect to Medicaid providers. Therefore, the Court finds that Provider Plaintiffs do not have a private right of action under the Equal Access Provision.

### 2. Cognizable Claim

■ Defendant argues that even if the Equal Access Provision confers a private right of action, Plaintiffs' alleged facts do not state a cognizable claim. Throughout Plaintiffs' complaint, Plaintiffs allege that certain medical services are simply unavailable in El Paso. For example, Plaintiffs point out that one Recipient Plaintiff, Ms. Melendez, alleges that her lack of access to medical services "stems from [a] lack of physicians and therapists in the El Paso Area." Pls.' First Am. Compl., at 10, ¶ 25.

The plain language of the Equal Access Provision does not require a certain level of medical professionals in an area; it only requires a certain relationship between the level of providers available to Medicaid recipients and the level of providers available to the general population. *See Clark*, 339 F.Supp.2d at 644 (quoting the legislative history of the Equal Access Provision in stating that "the Committee bill would not require that Medicaid payment levels be high enough to induce physicians to relocate into this area") (quoting H.R.Rep. No. 101–247, at 390–91, *reprinted in* 1989 U.S.C.C.A.N.1906, 2116–17). To illustrate, if no pediatric surgeon is available in El Paso to serve the general population, then it is not possible to assert an Equal Access Provision claim on that basis. However, if a pediatric surgeon is available to serve insured patients but not to provide services to Medicaid recipients, then an Equal Access Provision claim is possible. Thus, Defendant's allegation of a lack of Medicaid providers in El Paso, standing alone, fails to state a claim under the Equal Access Provision.

■ However, Plaintiffs point out that Ms. Melendez also alleges that her problems stem from "the lack of physicians and therapists willing to accept Medicaid [and] the number of physicians and therapists

---

**31.** This analysis also applies to Plaintiff Equal Access to the extent it is suing on behalf of its members who are Medicaid providers.

who have had to curtail their participation in Medicaid." Pls.' First Am. Compl., at 10, ¶ 25. Ms. Melendez also alleges that "[w]omen and children in El Paso covered by traditional insurance have better access to healthcare" than she does.[32] *Id.* The allegation that access to medical services in El Paso is not *equal* does state a cognizable legal theory under the Equal Access Provision. Furthermore, as long as Plaintiffs state one cognizable legal theory, it is not proper to dismiss their claim under the Equal Access Provision. *See Haddock v. Bd. of Dental Examiners of Calif.*, 777 F.2d 462, 464 (9th Cir.1985) (stating that "a complaint should not be dismissed if it states a claim under any legal theory, even if the plaintiff erroneously relies on a different legal theory").

Defendant's second argument is that Plaintiffs do not claim that they have been denied services, but rather that services have been delayed. Def. Albert Hawkins' Am. Mot. to Dismiss (hereinafter "Am. Mot. to Dismiss"), at 19. Defendant argues that the Equal Access Provision does not grant "recipients a right to speedy delivery of services." *Id.* However, long waits constitute at least some evidence that services are not available to Medicaid recipients in El Paso to the extent that services are available to the general population.[33] *See Clark*, 339 F.Supp.2d at 644 (stating that the plaintiffs could demonstrate unequal access through "reports that recipients are having difficulty obtaining care"). Moreover, Plaintiffs also argue that certain services are not available at all that are available to the general population. *See* Pls.' First Am. Compl., at 10, ¶ 25 (alleging that one Recipient Plaintiff

is unable to receive medical and therapeutic services for her children because they are unavailable to her in El Paso *"from a Medicaid provider"* and that "women and children in El Paso covered by traditional insurance have better access to healthcare") (emphasis added). Thus, Plaintiffs' alleged facts support at least one valid legal theory under the Equal Access Provision, and their claims under it cannot it be dismissed for failing to state a cognizable claim.

## C. The Quality of Care Provision

### 1. Private Right of Action

In addition to containing the Equal Access Provision, § 30(A) contains language, which the Court will refer to as the "Quality of Care Provision," that requires a state plan to "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... to assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). Unlike the Equal Access Provision, the Fifth Circuit has not explicitly addressed whether the Quality of Care Provision creates a private right of action for Medicaid recipients or providers. The *Evergreen* case only examined the Equal Access Provision portion of § 30(A). *Evergreen*, 235 F.3d at 927 n. 24. Therefore, this Court must make an independent determination of whether the Quality of Care Provision confers a private right of action upon each class of plaintiffs based on the *Blessing* factors as clarified by *Gonzaga.*

---

**32.** This dual allegation of an overall lack of providers in El Paso and a lack of providers willing to accept Medicaid is typical of Recipient Plaintiffs' claims. *See, e.g.,* Pls.' First Am. Compl., at 10, ¶ 26 (alleging both "a lack of physicians and dentists in the El Paso area"

and "the lack of physicians and dentists willing to accept Medicaid").

**33.** Of course, the evidence is only relevant if combined with evidence that the general population is not required to endure similar long waits for similar services.

### a. Right of Action for Recipient Plaintiffs[34]

■ To begin, an analysis of the Quality of Care Provision under the *Blessing* factors, as clarified by *Gonzaga*, differs from an analysis of the Equal Access Provision. With respect to the first *Blessing* factor, the Quality of Care Provision does not as clearly benefit Medicaid recipients as does the Equal Access Provision. To illustrate, the *Evergreen* court found Medicaid recipients are the intended beneficiaries of the Equal Access Provision because "the provision is 'phrased in terms' benefitting recipients in that it directly focuses on their access to medical care." *Evergreen*, 235 F.3d at 927 (quoting *Wilder*, 496 U.S. at 510, 110 S.Ct. 2510). The *Evergreen* court further clarifies that "section 30(A) speaks clearly in terms of the recipients because 'care and services' are [to be] available under the [state] plan at least to the extent that such care and services are available to the general population in the geographic area." *Id.* When compared to the Equal Access Provision, which clearly calls for an analysis of the extent of care available to individuals, the Quality of Care Provision does not as clearly implicate individual Medicaid recipients. The Quality of Care Provision makes no mention of "care and services" which must be "avail-able," clearly implying care and services available to individual recipients.[35]

Additionally, *Gonzaga's* clarification of the first *Blessing* factor strengthens the Court's conclusion that the Quality of Care Provision does not unambiguously confer a right on Medicaid recipients. In particular, the Quality of Care Provision lacks the kind of rights-creating language that *Gonzaga* defines as "critical" to determining Congress's intent to create a right. *Gonzaga*, 536 U.S. at 287, 122 S.Ct. 2268. As the *Sanchez* court noted, § 30(A) has an aggregate focus, in that the statute "speaks not of any individual's right but of the State's obligation to develop 'methods and procedures' for providing services generally." *Sanchez*, 416 F.3d at 1059.[36] The *Sanchez* court concluded that "[a] statutory provision that refers to the individual only in the context of describing the necessity of developing state-wide policies and procedures does not reflect clear Congressional intent to create a private right of Action." *Id.*

Because the Court finds that the Quality of Care Provision does not satisfy the first requirement of *Blessing*, it is not necessary to analyze the other factors.[37] Thus, the Court finds that the Quality of Care provision does not confer a private right of action upon Recipient Plaintiffs.

### b. Right of Action for Provider Plaintiffs[38]

---

**34.** This analysis also applies to Plaintiff Equal Access to the extent it is suing on behalf of its members who are Medicaid recipients.

**35.** If it mirrored the Equal Access Provision, the Quality of Care Provision would state that "payments must be sufficient to ensure quality care is available."

**36.** The Court acknowledges that this analysis also applies to the Equal Access Provision. However, as discussed above, the Court is bound by *Evergreen* to find that the Equal Access Provision creates a private right of action. *See supra* Part III(B)(1)(a) (explaining that *Gonzaga* merely cast doubt on the Fifth Circuit's determination in *Evergreen* ).

**37.** The Court also notes that, under the second *Blessing* factor, the Quality of Care provision is more "vague and amorphous" than the Equal Access Provision because it does not contain the "measuring rod" by which to evaluate quality of care that is contained in the Equal Access Provision. *See Evergreen*, 235 F.3d at 930–31 (noting that the Equal Access Provision allows a court to measure the access of Medicaid recipients against the access of members of the general population).

**38.** This analysis also applies to Plaintiff Equal Access to the extent it is suing on behalf of its members who are Medicaid providers.

■ Although the *Evergreen* court did not address the Quality of Care Provision, its Equal Access Provision analysis is helpful in determining whether it would find that the Quality of Care Provision confers a federal right on Medicaid providers. In *Evergreen*, the court held that the Equal Access Provision does not confer a private right of action upon Medicaid providers because § 30(A) "does not focus directly on providers." *Evergreen*, 235 F.3d at 929. The *Evergreen* court also noted that the courts that *did* construe the Equal Access Provision to confer a private right of action relied on the fact that " § 30(A) speaks of *payments* to these providers." *Id.* (emphasis added). The "payments" requirement also applies to the Quality of Care Provision. Therefore, the Court concludes that the Fifth Circuit would similarly reject the argument that the "payments" language is sufficient to support a finding that the Qualify of Care Provision creates a private of right of action in favor of Medicaid providers.

In addition, the Quality of Care Provision lacks rights-creating language in that it does not mention providers or any rights conferred upon them. *See Gonzaga*, 536 U.S. at 287, 122 S.Ct. 2268 (stating that "rights-creating language" is "critical to showing the requisite congressional intent to create new rights"). Like the Equal Access Provision, the Quality of Care Provision has an aggregate focus on the "methods and procedures" a state must provide. Therefore, the Court determines that the Quality of Care Provision does not confer a private right of action upon Medicaid Providers.

**D. The Comparability Provision**

**1. Private Right of Action[39]**

■ Plaintiffs' second count asserts a claim under, 42 U.S.C. § 1396a(a)(10)(B), which the Court will refer to as the "Comparability Provision," and its implementing regulations, 42 C.F.R. §§ 440.230 and 440.240.[40] The Comparability Provision requires the following:

that the medical assistance made available to any individual described in subparagraph (A)—

(I) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and

(ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A).

42 U.S.C. § 1396a(a)(10)(B). Neither the U.S. Supreme Court nor the Fifth Circuit has addressed whether the Comparability Provision provides a private right of action in favor of Medicaid recipients. Therefore, the Court will analyze whether the Comparability Provision grants a private right of action in favor of Recipient Plaintiffs under the *Blessing* factors, as clarified by *Gonzaga*.

Under the first *Blessing* factor, the Comparability Provision is clearly intended to benefit Medicaid recipients in that it provides for the amount, duration, and scope medical services available to eligible individuals. In addition, the provision includes rights-creating language in that it states that medical services "made available to any *individual*" who is categorical-

---

**39.** El Paso First does not assert a claim under the Comparability Provision, nor do Provider Plaintiffs on their own behalf. Joint Resp., at 26, ¶¶ 61–62.

**40.** *See supra* note 27 (explaining that: (1) implementing regulations cannot create a federal right if the statutes they are implementing do not confer a right; and (2) the regulations may aid a court in further defining and fleshing out the statutes they implement).

ly needy "shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B) (emphasis added). The provision has a clear focus on the individual rather than an aggregate focus, as required by *Gonzaga. Gonzaga,* 536 U.S. at 288, 122 S.Ct. 2268 (noting that the provisions under scrutiny "have an aggregate focus, they are not concerned with whether the needs of any particular person have been satisfied") (internal citations and quotations omitted).

Under the second *Blessing* factor, the Comparability Provision is not so "vague and amorphous" that it would strain judicial competence to enforce it. The provision requires a court "to compare the level of services provided to one recipient with those given another and to determine whether those services are comparable." *Rodriguez v. DeBuono,* 44 F.Supp.2d 601, 611 (S.D.N.Y.1999). This comparison provides courts with an "objective benchmark" in enforcing provisions, namely, the amount, duration, and scope the state provides to other recipients. *See Evergreen,* 235 F.3d at 931 (holding that the Equal Access Provision satisfies the second *Blessing* factor because the provision "affords the 'objective benchmark' of access to medical care equal to that of the general population in the same geographic area").

Under the third *Blessing* factor, the Comparability Provision uses mandatory, rather than precatory language when it mandates that medical assistance made available to Medicaid recipients "shall not" be less than the medical assistance made available to other recipients. 42 U.S.C. § 1396a(a)(10)(B)(I). *See also Rodriguez,* 44 F.Supp.2d at 611 (finding that the Comparability Provision satisfies the third *Blessing* factor). Therefore, the Comparability Provision satisfies the *Blessing* factors.

Furthermore, Defendant does not contend that Congress has precluded suits under the Comparability Provision, either expressly or through the provision of a comprehensive remedial scheme. *See Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 107, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (stating that "[t]he burden to demonstrate that Congress has expressly withdrawn the remedy is on the defendant"). Therefore, the Court finds that Congress unambiguously intended the Comparability Provision to confer a federal right on Medicaid recipients.

### 2. Cognizable Claim

The Comparability Provision sets forth requirements for "medical assistance made available to any individual *described in subparagraph (A)*." 42 U.S.C. § 1396a(a)(10)(B) (emphasis added). "Subparagraph (A) lists the individuals to whom medical assistance must be provided," referred to as the "categorically needy." *Rodriguez v. City of New York,* 197 F.3d 611, 615 (2d Cir.1999). The categorically needy lack sufficient income to meet their basic needs. *Id.* In contrast to the categorically needy, the "medically needy" are "those who have resources to meet their basic needs but not their medical ones." *Id.* Congress intended the Comparability Provision to ensure that "the primary concern of the states in providing financial assistance should be to meet their basic needs-termed the categorically needy." *Id.* (internal quotations omitted).

The Comparability Provision provides (1) "that if a state elects to provide Medicaid to the medically needy, it must also provide it to the categorically needy and that it may not provide more assistance to the former group than the latter"; and (2) "states may not provide benefits to some categorically needy individuals but not to

others." *Rodriguez v. City of New York*, 197 F.3d at 615. In sum, "[§ 1396a(a)(10)(B) ] precludes states from discriminating against or among the categorically needy." *Id.*[41] Congress has defined medical assistance as " 'payment of part or all of the cost of . . . care and services' included in an enumerated list of twenty-seven general health care categories." *S.D.*, 391 F.3d at 586 (quoting 42 U.S.C. § 1396d(a)).

■ Thus, stating a claim under the Comparability Provision requires two elements. First, a plaintiff must allege to be categorically needy, as defined by subparagraph 10(A). Second, a plaintiff must allege that the state is providing more favorable medical assistance to other recipients, as Congress defines medical assistance in the statute. Plaintiffs do not specifically claim to be categorically needy as defined by subparagraph 10(A). More importantly, Plaintiffs do not allege that HHSC is making *payments* on behalf of other categorically needy or medically needy recipients which are greater in amount, duration, or scope than payments made on behalf of Recipient Plaintiffs. Additionally, Plaintiffs admit that Medicaid payment

schedules of which they complain are in effect statewide. Pls.' First Am. Compl., at 3, ¶ 3. Plaintiffs merely assert that the uniform payment schedules have resulted in long waits in El Paso and the necessity in some circumstances to travel to other geographic areas within Texas where more services are available. They do not allege discrimination in HHSC's payments for the costs of care or services, claims which would fall within the statutory definition of medical assistance. *S.D.*, 391 F.3d at 586.[42] Therefore, Plaintiffs' alleged facts do not state a cognizable claim under the Comparability Provision.

### E. The Equity Provision

#### a. Private Right of Action [43]

■ Count three of Plaintiffs' complaint alleges causes of action under 42 U.S.C. § 1396a(a)(2), which the Court will refer to as the "Equity Provision." The Equity Provision provides as follows:

A State plan for medical assistance must—

. . . (2) . . . provide for financial participation by the State equal to all of such non-Federal share or provide for distri-

---

**41.** To support this understanding of the Comparability Provision, 42 C.F.R. § 440.250 states that:

> Except as limited in § 440.250—
> (a) The plan must provide that the services available to any categorically needy recipient under the plan are not less in amount, duration, and scope than those services available to a medically needy recipient; and
> (b) The plan must provide that the services available to any individual in the following groups are equal in amount, duration, and scope for all recipients within the group:
> (1) The categorically needy.
> (2) A covered medically needy group.

**42.** A cognizable claim under the Comparability Provision· could take several forms. For example, plaintiffs could claim that they are

forced to pay for medical services that are provided to other recipients without charge. *See Greenstein v. Bane*, 833 F.Supp. 1054, 1073–74 (S.D.N.Y.1993) (suggesting that such an allegation would state a cognizable claim under the "amount" portion of the Comparability Provision). Also, plaintiffs could claim that "(1) they were denied specific services covered by Medicaid, or (2) they were denied services because defendants decided not to reimburse those recipients who qualified for Medicaid through some other federal program, such as SSI or AFDC." *See id.* at 1073 (suggesting that such an allegation would state a cognizable claim under the "scope" portion of the Comparability Provision).

**43.** This analysis also applies to Plaintiff Equal Access to the extent it is suing on behalf of its members who are Medicaid recipients and providers.

bution of funds from Federal or State sources, for carrying out the State plan, on an equalization or other basis which will assure that the lack of adequate funds from local sources will not result in lowering the amount, duration, scope, or quality of care and service available under the plan.

42 U.S.C. § 1396a(a)(2). To the Court's knowledge, neither the U.S. Supreme Court nor the Fifth Circuit has addressed whether the Equity Provision provides a private right of action in favor of Medicaid recipients or providers. Therefore, the Court will determine whether the Equity Provision creates a private right of action in favor of any class of plaintiffs under the *Blessing* factors, as clarified by *Gonzaga*.

Under the first *Blessing* factor, it appears that Congress intended the Equity Provision to benefit Medicaid recipients, if anyone, because it seeks to ensure that the "amount, duration, scope, or quality of care and services under the plan" to Medicaid recipients does not suffer as a result of a lack of adequate funds from local sources.[44] However, the Equal Access Provision does not contain the rights-creating language which is critical to a conclusion that Congress unambiguously conferred a private right of action upon Medicaid Recipients. *See Gonzaga*, 536 U.S. at 287, 122 S.Ct. 2268 (stating that "rights-creating language" is "critical to showing the requisite congressional intent to create new rights"). The Equity Provision makes no mention of individual Medicaid recipients. Rather, it focuses on the systemwide procedures for allocating funds, which are required to be on an "equalization or other basis." *See id.* at 288, 122 S.Ct. 2268 (noting that the provisions under scrutiny "have an aggre-

gate focus, they are not concerned with whether the needs of any particular person have been satisfied"). Therefore, the Court finds that Congress did not unambiguously intend the Equity Provision to create a private right of action in favor of any plaintiffs.

*F. The Statewideness Provision*

*1. Private Right of Action* [45]

■ The fourth count of Plaintiffs' complaint alleges causes of action under 42 U.S.C. § 1396a(a)(1), which the Court will refer to as the "Statewideness Provision." The Statewideness Provision provides as follows:

A State plan for medical assistance must—

(1) provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them.

42 U.S.C. § 1396a(a)(1). To the Court's knowledge, neither the U.S. Supreme Court nor the Fifth Circuit has addressed whether the Statewideness Provision provides a private right of action in favor of Medicaid recipients or providers. Therefore, the Court will determine whether the Statewideness Provision creates a private right of action in favor of any class of plaintiffs under the *Blessing* factors, as clarified by *Gonzaga*.

Under the first *Blessing* factor, the Statewideness Provision does not clearly confer a benefit on any class of plaintiffs. It does not specifically mention any potential benefits for either Medicaid recipients or providers. Additionally, the Statewideness Provision lacks any "rights creating" language, making no specific mention of either Medicaid recipients or providers.

---

**44.** Therefore, the Court finds that Congress did not intend the Equity Provision to benefit Medicaid providers. Thus, the Court holds that Provider Plaintiffs do not state a claim under the Equity Provision.

**45.** This analysis also applies to Plaintiff Equal Access to the extent it is suing on behalf of its members who are Medicaid recipients and providers.

*See Gonzaga,* 536 U.S. at 287, 122 S.Ct. 2268 (stating that "rights-creating language" is "critical to showing the requisite congressional intent to create new rights"). Rather, the Statewideness Provision has an aggregate focus on the administration of a state plan, requiring it to be in effect in and mandatory upon all political subdivisions in a state. *See id.* at 288, 122 S.Ct. 2268 (noting that the provisions under scrutiny "have an aggregate focus, they are not concerned with whether the needs of any particular person have been satisfied"). Therefore, the Court finds that Congress did not unambiguously intend the Statewideness Provision to create a private right of action in favor of any plaintiffs.

### G. The Reasonable Promptness Provision

#### 1. Private Right of Action [46]

█ Plaintiffs' fifth count asserts a claim under 42 U.S.C. § 1396a(a)(8) and its implementing regulation 42 C.F.R. § 435.930.[47] Title 42 U.S.C. § 1396a(a)(8) provides as follows:

> A State plan for medical assistance must—
>
> ... (8) provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals.

Plaintiffs only assert a claim under the second portion of this provision, the portion requiring a state plan to furnish medical assistance with reasonable promptness, to which the Court will refer as the "Reasonable Promptness Provision." To the Court's knowledge, neither the U.S. Supreme Court nor the Fifth Circuit has addressed whether the Reasonable Promptness Provision provides a private right of action in favor of Medicaid recipients or providers. Therefore, the Court will determine whether the Reasonable Promptness Provision creates a private right of action in favor of any plaintiffs under the *Blessing* factors, as clarified by *Gonzaga.*

Under the first *Blessing* factor, the Reasonable Promptness Provision unambiguously confers a benefit on Medicaid recipients, and only on Medicaid recipients, in that it requires a state plan to provide medical assistance with "reasonable promptness *to all eligible individuals.*" 42 U.S.C. § 1396a(a)(8) (emphasis added).[48] Additionally, the Reasonable Promptness Provision contains rights-creating language in that it focuses on "all *individuals* wishing to make application for medical assistance" and on furnishing assistance "to *all eligible individuals.*" *Id.* (emphasis added). This language is indistinguishable from provisions the *Gonzaga* Court proffered as examples of statutes phrased in terms benefitting individuals. *See Gonzaga,* 536 U.S. at 284, 122 S.Ct. 2268 (providing Title IX of the Education Amendments of 1972 as an example of a statute containing rights-creating language).

---

**46.** This analysis also applies to Plaintiff Equal Access to the extent it is suing on behalf of its members who are Medicaid recipients. Provider Plaintiffs do not assert standing under the Reasonable Promptness Provision on their own behalf.

**47.** *See supra* note 27 (explaining that: (1) implementing regulations cannot create a federal right if the statutes they are implementing do not confer a right; and (2) the regulations may aid a court in further defining and fleshing out the statutes they implement).

**48.** Therefore, the Court finds that Congress did not intend the Reasonable Promptness Provision to benefit Medicaid providers. Thus, the Court holds that Provider Plaintiffs do not state a claim under the Reasonable Promptness Provision.

Under the second *Blessing* factor, although it is a close question, the Court finds that the Reasonable Promptness Provision is not so vague and amorphous that its enforcement would strain judicial competence. The fact that a statute requires a court to make an inquiry into reasonableness does not in and of itself render a provision too vague. For example, in *Wilder*, the Supreme Court upheld the Medicaid Act's requirement that states adopt Medicaid payment rates that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." *Wilder*, 496 U.S. at 519–520, 110 S.Ct. 2510. The *Wilder* Court relied on the facts that (1) "the statute and the regulation set out factors which a State must consider in adopting its rates" and (2) the statute provides "the objective benchmark of an 'efficiently and economically operated facilit[y]' providing care in compliance with federal and state standards while at the same time ensuring 'reasonable access' to eligible participants." *Id.* The Reasonable Promptness Provision does not provide a standard against which a court can measure whether a state is administering assistance with reasonable promptness. However, the implementing regulation of the Reasonable Promptness Provision "further define[s] the contours of the statutory right to reasonably prompt provision of assistance." *Doe v. Chiles*, 136 F.3d 709, 717 (11th Cir.1998). Title 42 C.F.R. § 435.930 provides as follows:

The agency must—

(a) Furnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures;

(b) Continue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible; and

(c) Make arrangements to assist applicants and recipients to get emergency medical care whenever needed, 24 hours a day and 7 days a week.

In addition, 42 C.F.R. § 435.911(a) requires the state to determine eligibility within "[n]inety days for applicants who apply for Medicaid on the basis of disability; and [f]orty-five days for all other applicants." The Court agrees that "[w]hile there may be a range of reasonable [time periods for provision of assistance], there certainly are *some* [time periods] outside that range that no State could ever find to be reasonable ... under the Medicaid Act." *Doe*, 136 F.3d at 717. Therefore, the Court finds that the Reasonable Promptness Provision, as further fleshed out by its implementing regulations, is not so vague and amorphous that its enforcement would strain judicial competence.

Under the third *Blessing* factor, the Court finds that the Reasonable Promptness Provision unambiguously imposes a binding obligation on the states. Congress drafted the Provision in mandatory, rather than precatory terms, by stating that medical assistance *"shall* be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8) (emphasis added). *See also Doe*, 136 F.3d at 718 (finding that 1396a(a)(8) is "cast in mandatory rather than precatory terms").

Defendant does not contend that Congress has precluded suits under the Reasonable Promptness Provision, either expressly or through the provision of a comprehensive remedial scheme. *See Golden State*, 493 U.S. at 107, 110 S.Ct. 444 (stating that "[t]he burden to demonstrate that Congress has expressly withdrawn the remedy is on the defendant"). Therefore, the Court finds that Congress unambiguously intended the Reasonable Promptness Provision to confer a private right of action upon Recipient Plaintiffs.

*2. Cognizable Claim*

▪ The Reasonable Promptness Provision requires a state plan for medical

assistance to provide medical assistance "with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8) (emphasis added). Congress has defined medical assistance as " 'payment of part or all of the cost of . . . care and services' included in an enumerated list of twenty-seven general health care categories." *S.D.*, 391 F.3d at 586 (quoting 42 U.S.C. § 1396d(a)). Thus, the Reasonable Promptness Provision requires *financial* assistance, not the provision of actual medical *services*. *Bruggeman*, 324 F.3d at 910 (stating that "the statutory reference to 'assistance' appears to have a reference to *financial* assistance rather than to actual medical *services*").[49] In addition, the implementing regulations indicate that "what is required is a prompt determination of eligibility and prompt provision of funds to eligible individuals to enable them to obtain the covered medical services that they need." *Id.* (citing 42 C.F.R. §§ 435.911(a) and .930(a)—(b)). In fact, "a requirement of prompt *treatment* would amount to a direct regulation on medical services." *Bruggeman*, 324 F.3d at 910.

Recipient Plaintiffs claim that low payment schedules have resulted in the reception of medical *services* that are not reasonably prompt. Pls.' First Am. Compl., at 11, ¶ 26 (emphasis added). For example, one Recipient Plaintiff is forced to endure "long waiting periods in health care provider's offices." *Id.* at 10, ¶ 26. Similarly, another Recipient Plaintiff "has been forced to seek services in Dallas on behalf

of one child", where such services are readily available for Medicaid Recipients. *Id.* at 10, ¶ 25. However, Plaintiffs do not claim delays in the reception of *financial* assistance. For example, Recipient Plaintiffs do not claim delays in the determinations of their eligibility for Medicaid. Thus, Recipient Plaintiffs' alleged facts do not state a cognizable claim under the Reasonable Promptness Provision.

### H. The Actuarial Soundness Provision

#### 1. Private Right of Action [50]

▮ Plaintiffs' sixth count asserts a violation of 42 U.S.C. § 1396b(m)(2)(A)(iii), which the Court will refer to as the "Actuarial Soundness Provision." The Actuarial Soundness provision requires the following:

> [N]o payment shall be made under this subchapter to a state with respect to expenditures incurred by it for payment (determined under a prepaid capitation basis or under any other risk basis) for services provided by any entity (including a health insuring organization) which is responsible for the provision (directly or through arrangements with providers of services) of inpatient hospital services and any other services described in paragraph (2), (3), (4), (5), or (7) of section 1396d(a) of this title for the provision of any three or more of the services described in such paragraphs unless— (iii) . . . such services are made on an actuarially sound basis.

Specifically, Plaintiffs contend that HHSC failed to establish capitation rates on an

---

**49.** Plaintiffs note that at least one court has indicated that the Reasonable Promptness Provision relates to the timeliness of matching a patient to care. *Sabree v. Houston*, 245 F.Supp.2d 653, 661 (E.D.Pa.2003). However, the *Sabree* court's reasoning is unpersuasive because it determined that the Reasonable Promptness Provision did not create a private right of action.

**50.** This analysis also applies to Plaintiff Equal Access to the extent it is suing on behalf of its members who are Medicaid recipients and providers. Provider Plaintiffs Thomason and Dr. Luna do not assert standing under the Actuarial Soundness Provision on their own behalf.

actuarially sound basis. Pls.' First Am. Compl., at 25, ¶ 60. To the Court's knowledge, neither the U.S. Supreme Court nor the Fifth Circuit has addressed whether the Actuarial Soundness Provision confers a private right of action upon Medicaid recipients or providers. Therefore, the Court will determine whether the Actuarial Soundness Provision creates a private right of action in favor of any plaintiffs under the *Blessing* factors, as clarified by *Gonzaga.*

Under the first *Blessing* factor, the Actuarial Soundness Provision does not clearly confer a direct benefit on any class of putative plaintiffs. In finding that the Actuarial Soundness Provision does not confer a right on Medicaid recipients or providers, the *Clayworth* court reasoned as follows:

> By contracting with the State, the managed care plan must guarantee to provide services to recipients. The actuarial soundness provision does not add anything that directly benefits the recipients, such as requirements of quality care or equal access. Moreover, it is at least unclear that the actuarial soundness provision is intended to create a right for providers to a certain reimbursement rate. It is equally plausible that the section is intended to protect the State plan from overpayment.

*Clayworth,* 295 F.Supp.2d at 1124 (internal citations and quotations omitted). Furthermore, the Actuarial Soundness Provi-

sion completely lacks rights-creating language. The provision has an aggregate focus on the State's methods of setting rates, rather than on whether the needs of particular individuals have been satisfied. *See Gonzaga,* 536 U.S. at 273–75, 122 S.Ct. 2268 (finding that the provisions in question did not contain the requisite rights-creating language because "they are not concerned with whether the needs of any particular person have been satisfied") (internal quotations omitted). Therefore, the Court finds that the Actuarial Soundness Provision does not confer a federal right upon any of the plaintiffs.

### I. Cognizable Supremacy Clause Claim [51]

 Plaintiffs allege that HHSC's setting of low payment rates violates the Supremacy Clause in that the rates are inconsistent with specific provisions of the Medicaid Act. To remedy these inconsistencies, Plaintiffs seek relief "under 42 U.S.C. § 1983." Pls.' First Am. Compl., at 26, ¶ 64. However, "[t]he Supremacy Clause, of its own force, does not create rights enforceable under § 1983." *Golden State,* 493 U.S. at 104–5, 110 S.Ct. 444. Therefore, to the extent Plaintiffs seek to remedy the alleged Supremacy Clause violation through § 1983, Plaintiffs must allege violations of a federal right. The only federal right Plaintiffs have established is based on the Equal Access Provision.[52] Thus, Plaintiffs only cognizable Supremacy Clause claim under § 1983 is one asserting that the Equal Access Provision [53] violates

---

**51.** As discussed above, Plaintiffs only have standing to assert a claim that HHSC's implementation of HB1 violates the Supremacy Clause. *See supra* Part II(E) (determining that Plaintiffs' lack standing to claim that HB1 itself violates the Supremacy Clause in that it conflicts with the Medicaid Act).

**52.** *See supra* Part III(B)—(H) (concluding that Plaintiffs' only assert a cognizable claim under the Equal Access Provision of the Medicaid Act).

**53.** Plaintiffs could also theoretically assert that HHSC's actions violate the Comparability Provision or the Reasonable Promptness Provision through a § 1983 claim. However, as discussed above, Plaintiffs do not state a cognizable claim under the Comparability Provision or the Reasonable Promptness Provision that would require a Supremacy Clause analysis. *See supra* Part III(D),(G) (explaining that Plaintiffs do not state a cognizable claim pursuant to the Comparability Provi-

the Supremacy Clause. This Supremacy Clause claim is functionally equivalent to Plaintiffs' claim under § 1983 discussed earlier.[54] Therefore, there is no need to further analyze this claim.

In addition, Plaintiffs' complaint arguably states an *Ex Parte Young* cause of action in that Plaintiffs are suing for prospective relief against state officials in their official capacity for an ongoing violation of federal law. *AT & T Commc'ns v. BellSouth Telecomm. Inc.*, 238 F.3d 636, 647 (5th Cir.2001) ("Under the Ex parte Young doctrine, a private party may sue individual state officers in federal court to obtain prospective relief from an ongoing violation of federal law"). Such a claim could be functionally distinct if it afforded relief for violations of provisions of the Medicaid Act that the Court did not find to create a federal right enforceable under § 1983. However, the Court finds that the Supreme Court would be unlikely to recognize a claim that state *action* violates a federal law absent an express statutory right of action, either under the Medicaid Act or under § 1983. *See Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (refusing to recognize a claim that Alabama's policy of administering its driver's license examinations only in English violated federal regulations promulgated under Title VI because Congress did not intend to confer a private right of action to enforce the regulations); *see also* Davis Sloss, *Constitutional Remedies for Statutory Violations*, 89 Iowa L.Rev. 355, 358 (2004) (explaining that in "cases in which private plaintiffs sue state officers to enjoin state executive action that allegedly violates a federal statute .... the [Supreme Court] does not address the merits

of plaintiff's claim unless the plaintiff can establish an express statutory private right of action, either under the federal statute that creates the substantive right, or under § 1983"). Therefore, Plaintiffs do not state a cognizable claim under the Supremacy Clause that is distinct from their § 1983 claim pursuant to the Equal Access Provision.[55] Thus, functionally, Plaintiffs state only one cognizable claim, a claim that HHSC's payment rates violate the Equal Access Provision.

*J. Cognizable Equal Protection Clause Claim*

 Count eight of Plaintiffs' complaint alleges that "Defendant's practices and procedures for administering Medicaid services in El Paso County, Texas violate the 14th Amendment of the U.S. Constitution in that individuals in El Paso County who are enrolled in Medicaid are not treated equally by HHSC when compared to other individuals in the State of Texas." Pls.' First Am. Compl., at 26, ¶ 66. Specifically, Plaintiffs allege that "Medicaid recipients in El Paso receive much less funding per-person than does the average Medicaid recipient in Texas." *Id.*

The Equal Protection Clause of the Fourteenth Amendment requires that all similarly situated persons be treated substantially alike. *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). The Fifth Circuit has stated that "when state welfare statutes are challenged under the equal protection clause, they are subject to examination only for some rational relationship to a proper state end, an examination minimally exacting." *Curtis v. Taylor*, 625 F.2d 645, 650

---

sion or the Reasonable Promptness Provision).

**54.** *See supra* Part III(B) (determining that Recipient Plaintiffs state a cognizable claim under the Equal Access Provision).

**55.** An *Ex Parte Young* claim does not offer relief unavailable to a § 1983 claimant. Therefore, it is not necessary to treat Plaintiffs' possible *Ex Parte Young* claim as distinct from Plaintiffs' § 1983 claim.

(5th Cir.1980). However, "that does not automatically render such challenges frivolous. State welfare regulations must have a rational basis for the distinctions they draw." *Id.* Additionally, the Court should proceed to consider the merits of Equal Protection claims unless "prior decisions inescapably render the claims frivolous." *Id.* at 649–50.

Plaintiffs' Equal Protection claims are two-fold. First, Plaintiffs claim that Medicaid recipients in El Paso do not receive the same level of service as recipients in other parts of the state. Second, Plaintiffs claim that Medicaid providers in El Paso are paid lower capitation rates than providers in other parts of the state. With respect to Plaintiffs' first claim, Plaintiffs admit that the "Medicaid fee schedules are in effect Statewide." Pls.' First Am. Compl., at 3, ¶ 3. In Plaintiffs' own words, "if a physician in El Paso performs a simple delivery of a baby, she is reimbursed the same under the Medicaid fee schedules as a physician in Houston who performs the identical procedure." *Id.* Similarly, with respect to Plaintiffs' second claim, Plaintiffs do not challenge HHSC's assertion that it uses the same formula for setting capitation rates throughout Texas, a formula based on the cost and utilization of services in a geographic area. *See supra* note 1 (explaining how HHSC calculates capitation rates). Plaintiffs do not challenge HHSC's methodology in setting capitation rates based on the cost and utilization of services. Basing capitation rates on the costs and utilization of services is clearly rationally related to the state's objective of providing medical services.

Therefore, Plaintiffs admit that HHSC administers Medicaid in El Paso using the identical methods it uses throughout the state. Assuming Plaintiffs could meet their burden of establishing an Equal Protection violation, Plaintiffs appear to request that the Court fashion a remedy that would require HHSC to treat El Paso *more favorably* than the rest of the state, presumably by instituting higher fee schedules and more favorable capitation formulas for El Paso than for the rest of the state. Not only do Plaintiffs fail to state a claim under the Equal Protection Clause, but the implementation of Plaintiffs' requested relief very well might create an Equal Protection issue, given the difference in fee schedules and capitation formulas.[56] Thus, Plaintiffs' alleged facts do not state a cognizable claim under the Equal Protection Clause.

### K. Declaratory Judgment Relief

Defendant claims that Plaintiffs are not entitled to a declaratory judgment because "Plaintiffs have not established an actionable right under any other law." Original Mot. to Dismiss, at 16. Plaintiffs are correct that the Declaratory Judgment Act does not create an independent cause of action. *Bauhaus USA, Inc. v. Copeland,* 292 F.3d 439, 448 n. 11 (5th Cir.2002) (citing favorably the proposition that in passing the Declaratory Judgment Act, "Congress enlarged the range of remedies available in the federal courts but it did not extend their subject-matter jurisdiction") (citing 10B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2766 (3d ed.1998)). However, as explained

---

**56.** For example, if doctors in Houston were paid less for the performance of identical services, they might be able to claim that HHSC has no rational basis for this unequal treatment. Similarly, if HHSC used a capitation formula more favorable to El Paso Medicaid recipients, Medicaid recipients in other regions might be able to bring a claim that compensating providers beyond what the cost and utilization of services warrants has no rational relationship to the state's purpose of providing medical services.

above, the Court finds that Recipient Plaintiffs have stated a cognizable claim under the Equal Access Provision of the Medicaid Act. Therefore, Plaintiffs have stated a proper claim pursuant to the Declaratory Judgment Act.

## IV. PRINCIPLES OF JUDICIAL ADMINISTRATION—THE *FREW* CLASS

■ Defendant argues that principles of judicial administration require the Court to find that Plaintiff-children's claims are barred by the ongoing case *Linda Frew, et al. v. Albert Hawkins, et al.,* No. 3:93–CV–65 (E.D.Tex. Sept. 1, 1993). The *Frew* case is a class action challenging the adequacy of HHSC's provision of Early, Periodic, Screening, Diagnosis and Treatment ("EPSDT") services to young Medicaid recipients. Am. Mot. to Dismiss, Frew–3rd Am. Compl., at 2, ¶ 2. The *Frew* class consists "of all present and future Texas Medicaid recipients who are under the age of 21, and therefore eligible for EPSDT services, but who have not received the entire range of EPSDT services to which they are entitled." Am. Mot. to Dismiss, Frew–Order of 6/16/94.

In the case of *Gillespie v. Crawford,* 858 F.2d 1101 (5th Cir.1988), Gillespie filed a suit for equitable relief from allegedly unconstitutional Texas prison conditions. The Fifth Circuit held that Gillespie's equitable claims were barred by the orders and pendency of *Ruiz v. Estelle,* 503 F.Supp. 1265 (S.D.Tex.1980), a class action which "challenged successfully the constitutionality of conditions at prisons operated by [the Texas Department of Corrections]." *Gillespie,* 858 F.2d at 1102. The *Ruiz* class was "composed of all past, present and future inmates confined by the Texas Department of Corrections." *Id.* Subsequent to *Ruiz,* a Fifth Circuit panel in *Green v. McKaskle,* 770 F.2d 445, 446–47 (5th Cir.1985), held that individual class members should be barred from pursuing lawsuits that seek equitable relief "within the subject matter" of the *Ruiz* class. In agreement with the *Green* panel, the *Gillespie* court held that Gillespie's claims were barred for the following reasons:

> Permitting multiple courts to entertain equitable claims and issue decrees that might affect the Texas prison system would require other courts to become familiar with the *Ruiz* decree, the current problems of the Texas prison system, and the possible disruptive effect of the exercise of equitable powers over matters covered by the *Ruiz* decree. Moreover, if separate suits for equitable relief are filed in other districts than that in which *Ruiz* is pending, even with respect to problems not encompassed by the relief granted in *Ruiz,* the court's orders may hobble the effect of the *Ruiz* court's continuing decree over the Texas prison system and its power both to enforce and to modify that decree.

*Gillespie,* 858 F.2d at 1103.

Unlike in *Gillespie,* Plaintiff-children's claims are not within the subject matter of the *Frew* class. The *Frew* class does not allege claims under any of the Medicaid provisions pursuant to which Plaintiffs sue in the instant case. Specifically, the *Frew* class does not assert a violation of the Equal Access Provision, the only provision pursuant to which Plaintiffs have asserted a cognizable claim. Moreover, the *Frew* class challenges the methods and procedures through which HHSC administers EPSDT, but it does not appear to challenge the adequacy of Medicaid payment rates. Plaintiffs' sole surviving challenge in the instant case is to the adequacy of Medicaid payment rates. Therefore, evaluating the instant case does not require the Court to familiarize itself with the *Frew* decree, nor has Defendant shown how the Court's decision could interfere with the *Frew* case. Thus, Plaintiff-chil-

dren's claims are not barred by principles of judicial administration as a result of the *Frew* class.

## V. CERTIFICATION FOR INTER-LOCUTORY APPEAL

■ Defendant requests that the Court certify this case for interlocutory appeal pursuant to 28 U.S.C. § 1292 (" § 1292"). Section 1292(b) states the following:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal may thereupon, in its discretion, permit an appeal to be taken from such an order, if application is made to it within ten days after the entry of the order....

The Court is of the opinion that all three statutory requirements have been met. *See Aparicio v. Swan Lake*, 643 F.2d 1109, 1111 (5th Cir.1981) ("Section 1292(b) sets out three criteria all of which must be met before the district court may properly certify an interlocutory order for appeal."). Specifically, there is ground for a difference of opinion with respect to the following controlling questions of law: (1) whether Recipient Plaintiffs have standing to bring any of their claims; [57] and (2) whether the Equal Access Provision of the Medicaid Act confers a private right of action upon Recipient Plaintiffs. Either a finding that Recipient Plaintiffs lack standing or that the Equal Access Provision does not

confer a private right of action upon Recipients Plaintiffs would dispose of the case. Furthermore, the Court finds it likely that the Fifth Circuit will decide that the Equal Access Provision does not confer a private right of action upon Recipient Plaintiffs in light of the decision of the Supreme Court in *Gonzaga*. Therefore, it would be an improper use of judicial resources and the resources of the parties to proceed with the case before these aforementioned questions of law are decided. Thus, this case should be certified for interlocutory appeal to the Court of Appeals for the Fifth Circuit.

## VI. CONCLUSION

To summarize, the Court finds that both Recipient Plaintiffs and Provider Plaintiffs have standing to assert their claims under the Medicaid Act. Plaintiff Equal Access has associational standing to sue on behalf of its member Medicaid recipients and providers, but Provider Plaintiffs do not have third-party standing to sue on behalf of their patients and members. Plaintiffs also have standing to assert their Supremacy Clause claim to the extent they challenge HHSC's implementation of Medicaid in El Paso. However, the only cognizable claim under the Medicaid Act is Recipient Plaintiffs' claim under the Equal Access Provision. Plaintiffs also state a claim under the Supremacy Clause that is functionally equivalent to their Equal Access Provision claim pursuant to § 1983, but they do not state a claim under the Equal Protection Clause. The Court also holds that principles of judicial administration do not compel the Court to bar the claims of Plaintiff-children as a result of the *Frew* case.

In the final analysis, only one claim remains: Recipient Plaintiffs' claim that

---

57. In particular, it is a close question whether Recipient Plaintiffs have standing in light of the allegation that their injuries are a result of

El Paso's unique payor mix, an independent factor not caused by HHSC's conduct.

HHSC's low payment rates violate the Equal Access Provision of the Medicaid Act. Even this sole remaining claim stands on uncertain ground because it is likely that the Fifth Circuit will decide that Congress did not intend the Equal Access Provision to confer a private right of action upon Medicaid recipients in light of the more stringent requirements of *Gonzaga.* Therefore, the Court finds it appropriate to certify this case for interlocutory appeal to the Court of Appeals for the Fifth Circuit for the resolution, in its discretion, of the legal issues presented in this opinion.

Accordingly, **IT IS ORDERED** that Defendant's Motion to Dismiss (Docket No. 57) is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that the above-captioned cause is certified for interlocutory appeal to the Court of Appeals for the Fifth Circuit and that either party may appeal this case to the Court of Appeals for the Fifth Circuit within ten days of the entry of this order.

**IT IS FINALLY ORDERED** that the above-captioned cause is **STAYED** pending resolution by the Court of Appeals for the Fifth Circuit.